**TODD SHIPYARDS CORPORATION v. THE CITY OF ATHENS et al.**

No. 2942.

United States District Court
D. Maryland.

Feb. 28, 1949.

See also 73 F.Supp. 362.

John H. Skeen (Frank, Skeen & Oppenheimer), of Baltimore, Md., and E. Curtis Rouse, of New York City, for Todd Shipyards Corporation.

Sidney Hillman (Hillman & Hillman), of Baltimore, Md., and Harry D. Graham, of New York City, for intervening passenger libellants Rae, Acker, et al.

Southgate L. Morison (Ober, Williams, Grimes & Stinson), of Baltimore, Md., for United States Lines as assignee of certain passenger claimants and Panamanian Lines, Inc.

Robert W. Williams (Ober, Williams, Grimes & Stinson), of Baltimore, Md., for Phillip L. Rhodes.

Sol C. Berenholtz, of Baltimore, Md., for officers and members of crew.

Robert H. Williams, Jr., of Baltimore, Md., for Dracoulis, Ltd., Gastaldi & Co., and Nicolas Kambanis.

CHESNUT, District Judge.

The SS "City of Athens", a trans-Atlantic passenger-cargo ship, was libelled in the Port of Baltimore on July 12, 1947 by the Todd Shipyards Corporation of New York, for the balance due for repairs and reconstruction of the ship in the total amount of $491,077. Many intervening libels and other claims against the ship were filed; and in due course the ship was sold by the Marshal of the court on August 13, 1947 to the Panamanian Lines, Inc., for $400,000, which sum (together with the sum of $1837.71 representing earned freight) less certain expenses of administration, represents the total sum available

for lien claims in the amount of $775,457.-82. On August 14, 1947 the case was referred to Mr. L. Vernon Miller, a member of the Baltimore Bar thoroughly experienced in admiralty matters, as Commissioner, "to take evidence therein and to report to the Court his findings of law and fact therein with all convenient speed", and the clerk was directed to give notice by publication that all claims against the proceeds of the ship should be filed within a specified time. The Commissioner's report was filed October 7, 1948. The delay seems to have been unavoidable in view of the very large number of claims which had been filed and which had to be considered by the Commissioner, many of the claimants being foreigners and the questions both of fact and of law having been important and some of them difficult. The Commissioner's report, with accompanying schedules, fills 161 large typewritten pages. The Commissioner also filed with his report a stenographic transcript of the evidence before him consisting of more than 1500 pages resulting from 15 hearings. A reference to the report itself will show the extended consideration given to the respective claims filed in the case.

Schedule X (the last page of the report) lists in summary all claims allowed as liens. They embrace basic wages of the crew in the amount of $24,733.74; additional wages for the crew at $15,141.54; one extra month's pay for certain members of the crew $2,033; repatriation claims $945; additional wages to skeleton crew July 12 to July 22, 1947, $1,375.66; maintenance and cure $236.25; personal injury claims $4,000, and unclassified crew claims in the amount of $8,422.25; head tax claims of $1,624, and cargo claims $1,074.57. The total of such claims was $59,586.01. Other claims for supplies or "necessaries" to the ship on various voyages allowed as liens aggregated $715,871.81. Of this latter amount those accruing in the calendar year 1947 amounting to $291,921.68 were determined to be paid in full as having priority, and the remainder, $423,950.13, a large amount of which was allowed to the Todd Shipyards Corporation arising in 1946, was to be deferred to the prior payment claims. The estimated net fund available for distribution after deducting certain expenses of administration including the Commissioner's fee, will be about $380,000. The total claims allowed priority in payment and thus to be paid in full, aggregate $351,507.69. As the deferred claims aggregate $423,950.13, and the remainder of the fund available for distribution is only about $30,000, it appears that the claims deferred in payment by the Commissioner's report will receive a dividend of less than 10%.

The Commissioner rejected as maritime liens and therefore made no allowance for distribution to certain claimants. The principal class of such claims so rejected were those of more than 300 prospective passengers who had bought and paid for transportation by the ship on a projected voyage from New York to Mediterranean Ports with a sailing date of July 19, 1947, seven days after the ship was libelled in Baltimore; and for even later sailing dates up to October 13, 1947. Many, if not all, of these passengers filed claims for the return of passage money paid and incidental damages for breach of contract of carriage totalling nearly $500,000. After very full consideration in the report the Commissioner rejected all these claims on the ground that none of them constituted a maritime lien on the ship. There were also about 100 seamen in the crew of the ship. While the great majority of the claims of these seamen were allowed, a minor part of the amounts claimed by a number of the seamen and the whole of the claims of a few were rejected by the Commissioner for the reason stated in the report.

In due course, after the filing of the report, separate exceptions to the report have been filed by 26 individuals or classes of claimants; many of the exceptions embrace numerous sub-divisions. A hearing for all the exceptions, after due notice, was set by the court for January 20, 1949. At the beginning of the hearing the court referred to the large number of exceptions which had been filed and stated that all interested parties would be heard in oral presentation of the exceptions; but that the court would consider as waived any and all exceptions which were not orally argued or presented by counsel or parties. Oral argument for

two full days was presented on behalf of various exceptants by ten counsel, and numerous briefs were filed by them and considered. At the hearing many of the exceptions were expressly waived or abandoned, and those not orally presented were considered impliedly waived. In result the exceptions which are still pressed may be conveniently classified now into three parts: (1) Passenger claims; (2) the preferred and deferred classification of supply or so-called "necessary" claims; and (3) certain miscellaneous claims. These will be discussed in their order, but first it will be helpful to make a brief statement with respect to the history and activities of the ship and particularly of her several voyages under her last ownership before the libel. And as all the claims have been so fully considered both as to the facts and the applicable law in the Commissioner's report, it will be sufficient here to recite only the dominant considerations of fact and law which are involved in the several questions to be considered.

The ship was built in 1920 at Hog Island, Pennsylvania, and named "The American Banker". She was of 7430 gross tonnage, 436.9 feet in length and 58.2 foot beam. Later she was renamed the "Ville D'Anviers" and under that name acquired in 1946 by the Sociedad Naviera Trans-Atlantica S. A. a Panamanian corporation, and registered under the Honduras flag. The corporation seems to have had little or no assets other than the ownership of the ship, but the stock of the corporation was owned by Basil Hanioti, of Greek extraction but a citizen of the United States. He also owned directly or indirectly at the time one or more other ships. It is said that Hanioti paid $430,000 for the ship which he purchased for the special purpose of passenger and cargo transportation between New York and Mediterranean ports. The ship had previously been used as a troop transport. To adapt her to the new and anticipated large passenger traffic, it was deemed essential to make extensive repairs and for that purpose the Todd Shipyards, a New York corporation, was employed. Todd began work on the ship in October 1946. It was evidently a rush job because Hanioti was insistent upon early completion to take advantage of anticipated large passenger business. It appears that the work was done night and day with much overtime and possibly without adequate detailed supervision in the interests of the owner. But the Commissioner found no satisfactory evidence to contradict the reasonableness of the itemized invoices and accounts rendered by Todd in support of its claim. By November 12, 1946 Todd had done work as per invoices in the amount of $646,105. The ship made her first voyage to Europe leaving New York in November 1946. In due course she returned to New York about January 1, 1947 and thereafter during 1947 made three additional round-trips, the last one terminating at Baltimore in early July 1947. During 1947 Todd performed additional repair and construction work on the ship making its aggregate charges $758,010, with total cash and credits paid or allowed in the amount of $266,933, with balance now claimed to be due in the amount of $491,077, of which amount the Commissioner by schedule D (page 157) has allowed $104,972 as ranking in 1947; and allowed a balance of $386,105 ranked in 1946 for deferred payment.

It appears from the report that the cost of repair of the ship by Todd was very greatly in excess of what Hanioti had anticipated, and that his insufficient capital resources finally resulted in the libelling of the ship. After the ship was libelled in Baltimore Hanioti was unable to pay the wages due to the crew not only for the last voyage but for some preceding voyages. During each of the ship's voyages it became necessary to obtain for her, frequently in foreign ports, supplies and "other necessaries". Claims for these have been filed in these proceedings and practically all have been allowed by the Commissioner as maritime liens, all those arising from the last three voyages of the ship in 1947 to be paid in full and those incidental to the first voyage in 1946 were also allowed but deferred as to payment.

*Passenger Claims:* The fifth voyage of the ship was fixed for sailing from New York July 15, 1947, subsequently postponed to July 19, 1947. The Hanioti interests had employed one or more travel agencies or shipping agents to sell tickets for such

transportation. Many such tickets had been sold and paid for to the agents. For some reason not fully explained, on her last return voyage the ship came to Baltimore instead of going to New York. The crew were then discharged but without payment, as a result of the libel and the inability of the owner to provide the necessary wages. It was stated by counsel that the reason for ending the last voyage at Baltimore instead of New York was a prospective cargo to be picked up here. It was also stated by counsel for Todd that they finally decided to then file their libel by reason of certain unsatisfactory information which had been then recently obtained with regard to possible future movements of the ship. But however that may be, the necessary result was the abandonment of the projected new voyage from New York without refunding the passage money to the many passengers who had paid for transportation. As the new projected voyage was to start from New York, it is said that many of the prospective passengers had proceeded to that place in anticipation of sailing on July 15 or July 19, and had brought with them their baggage and as a result of cancellation of the voyage, sustained an alleged larger amount of additional damages. But of course none of the passengers had ever boarded the ship for transportation nor had any of their baggage, some of which was said to have been delivered to the ship's agent in New York, been placed on the ship. A few of the tickets sold called for a round-trip passage and it appears also that a few passengers who had made a prior voyage from the United States to Europe on the ship held contracts entitling them to a return voyage upon presentation at a Mediterranean Port and the issuance of a new ticket. After very full consideration the Commissioner concluded that these contracts of affreightment for passenger transportation, although maritime contracts of which the admiralty court would have jurisdiction, did not constitute maritime liens being wholly contractual in nature and executory in performance. After full review of the applicable authorities he reached the conclusion that such contracts, though breached in performance, did not constitute maritime liens either for the re-

fund of passage money or for the payment of incidental damage. He accordingly disallowed all such claims and found no basis for legal distinction or exception with regard to the comparatively few so-called round-trip tickets which were in effect divisible as to performance. As the Commissioner has so fully discussed the applicable law, I will here state only the principal and dominant reasons for my affirmance of his conclusion as to the disallowance of these claims.

It must be borne in mind, in the consideration of these claims, that the basic question is a narrow one and is whether or not the cause of action which has accrued to the prospective passengers is one which entitles them to a maritime lien for it is necessary for them, in order to share in the proceeds of the fund under consideration, to establish such a lien. Only some transactions concerning a ship give rise to maritime liens, the scope of which is very narrow and which because of its secret nature should not be enlarged. If no such lien can be established, the passenger libellants must fail here, for we are not here immediately concerned with the broader question of their right to recover in other courts, from other defendants in other types of legal proceedings.

The crucial question is whether prospective passengers, who have bought tickets for transportation but have not boarded the ship, have a maritime lien for breach of executory contract. While there were some early federal decisions which supported the affirmative view, the modern admiralty law upon the subject is now well settled to the contrary. In considering the question on principle it is well to bear in mind some long established doctrines of the admiralty law. The maritime lien is of very ancient lineage. Its conceptual origin lies in the personification of the ship itself. The ship as an entity, considered apart from the personal liability of the owner, becomes responsible for benefits conferred and damages committed by her. One who bestows such benefits or suffers such damage becomes entitled to an interest in the ship *(jus in re)* which constitutes the maritime lien, which is generally distinguished

from the common law lien in that the former is not possessory in nature while the latter is. Thus the maritime lien constitutes an interest in the ship itself while ordinarily the common law lien is not an interest *in* the thing subject to it but a right to enforce a claim *against* it. Again, the enforcement of the true maritime lien is the peculiar and exclusive jurisdiction of the federal courts in admiralty. Benedict on Admiralty, Vol. 1, ch. 3, p. 21, 6th Ed. by Knauth; Robinson on Admiralty, p. 363, et seq.

The judicial decisions are well reviewed in the Commissioner's report (pp. 67 to 72). A contract for the carriage of cargo or passengers is a contract of affreightment; and there is no distinction in principle between the liabilities of the ship in the two cases. The Moses Taylor, 4 Wall. 411, 427, 71 U.S. 411, 18 L.Ed. 397; Benedict on Admiralty, Vol. 1, § 97. While some earlier cases asserted the liability of a ship in rem for failure to transport cargo even though not placed on board the ship, the later cases in the Supreme Court definitely establish the law to the contrary. This is clearly pointed out in the opinion of Mr. Justice McReynolds in Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490, 496, 500, 43 S.Ct. 172, 67 L.Ed. 364. The earlier cases were first overruled by The Freeman, 1856, 18 How. 182, 188, 59 U.S. 182, 15 L.Ed. 341, and The Yankee Blade, 1857, 19 How. 82, 90, 60 U.S. 82, 15 L.Ed. 554, the doctrines of which were reaffirmed in the Osaka case in 1922 where, quoting from the case of The S. L. Watson, 1 Cir., 118 F. 945, 952, the court said:

"The rule of admiralty, as always stated, is that the cargo is bound to the ship and the ship to the cargo. Whatever cases may have been decided otherwise disregarded the universal fact that no lien arises in admiralty except in connection with some visible occurrence relating to the vessel or cargo or to a person injured. This is necessary in order that innocent parties dealing with vessels may not be the losers by secret liens, the existence of which they have no possibility of detecting by any relation to any visible fact. It is in harmony with this rule that no lien lies in behalf of a vessel against her cargo for dead freight, or against a vessel for supplies contracted for, but not actually put aboard."

And in the later case of Krauss Bros. Co. v. Dimon S.S. Corp., 290 U.S. 117, 121, 54 S.Ct. 105, 106, 78 L.Ed. 216, Mr. Justice Stone said:

"This engagement of a vessel, or its hypothecation, as distinguished from the personal obligation of the owner, does not ensue upon the mere execution of the contract for transportation. Only upon the lading of the vessel or at least when she is ready to receive the cargo—where there is 'union of ship and cargo'—does the contract become the contract of the vessel and the right to the lien attach. No lien for breach of the contract to carry results from failure of the vessel to receive and load the cargo or a part of it. See Osaka Shosen Kaisha v. Pacific Export Lumber Co., supra."

In an earlier case (1897) which seems to be the only one dealing with the factual situation of a passenger who had bought a ticket but was unable to board the ship by the owner's default, it was held, after review of earlier similar cases with regard to shipment of goods rather than passengers, that the prospective passenger could not maintain a libel in rem against the ship. The Eugene, D.C.Wash., 83 F. 222. See also Id., 9 Cir., 87 F. 1001.

In the Cypress, 4 Cir., 171 F.2d 435, 440, a passenger had prepaid for a voyage prevented by the libelling of the ship. He did not assert a lien for the passage money but caused the arrest of the captain. A member of the crew advanced to the captain $300 to satisfy the passenger, and then asserted a lien for the payment; but the lien was denied.

Counsel for the passenger claimants concede that there is no statutory or judicial authority in support of their contention for a maritime lien, but nevertheless they ask the court to now create such a lien on the theory that the ship can be made liable *in tort* for the breach of duty as a common carrier to fulfill a contractual obligation made for transportation of passengers. In support of this view they seek to analogize the present claims to the decision

of this court by Judge Soper when District Judge, in the case of The Henry W. Breyer, 4 Cir., 17 F.2d 423. But an examination of this case shows very clearly that it does not support the contention because there the tort claim which was established, with priority over a mortgage, was based on the fact that the claimant's cargo had been actually put upon the ship and the damages resulted from its trans-shipment. That case, therefore, was no departure from but only a recognition of a long existing right of a claimant to sue in tort for damages resulting from wrongful action of a common carrier with respect to passengers or cargo after they had physically come within the control of the carrier. And even if we assume that a common carrier may be sued in tort for failure to fulfill an executory obligation to a passenger, who did not come within the care or control of the carrier (See Heirn v. McCaughan, 32 Miss. 17, 66 Am.Dec. 588) it does not follow that a breach of such executory contract creates a lien in rem. Thus it may well be that the shipowner in the present case may be sued in tort by the prospective passengers either in the civil law courts or even in personam in admiralty, but they have no maritime lien to enforce in rem against the ship. The shipowner, and not the ship as an entity, is the common carrier. Liverpool v. Phenix Ins. Co. 129 U.S. 397, 457, 9 S. Ct. 469, 32 L.Ed. 788. The obligation to transport passengers either in accordance with a previous contract or advertised schedule is not the obligation of the vehicle used for transportation, but of the owner or operator of the vehicle.

Furthermore, the contention now made is inconsistent with the nature of the maritime lien which flows from the concept of the personification of the ship and which in turn connotes the idea of responsibility of the ship as an entity for benefits conferred upon or damages caused by it. Not only is the contention unsound on the principles of admiralty law, but it would be very detrimental in practice to shipping interests. It is highly important that a ship, especially in a foreign port, be able to obtain supplies or repairs on its own credit in order to continue its voyage. It is for this purpose among others, that the admiralty law has created the maritime lien. The credit is extended on the faith of the value of the ship itself, and in further support of that credit the admiralty law gives priority to the last lien rather than to prior liens. In the instant case if the passenger claims are to be established as maritime liens in tort, they would also apparently outrank for priority of payment, liens for very necessary repairs to the ship in a foreign port. Since any duty to the prospective passengers is imposed only on the shipowner, the grant of a maritime lien for any breach of that duty would be inconsistent with the definition and purpose of that type lien, would destroy the purpose and policy of the lien and would make it synonomous with a right in personam. Such a result would be highly detrimental to the ability of a ship in a foreign port if the claim of a supplier would be subject to be defeated by a lien arising from a subsequently maturing obligation for the carriage of passengers as well as by subsequently incurred debts for repairs, supplies, etc.

As an alternative to the proposition that the prospective passengers here obtained a maritime lien, their counsel advances quite a different contention. It is in effect that under the facts of the case the court should hold on general equitable principles that the whole claim of the Todd Shipyards should be disallowed. The basis for this contention is vaguely rather than clearly stated but seems to be advanced on one or more or all of the equitable doctrines of (1) waiver by Todd of its lien claim by laches in asserting it; (2) fraud or estoppel to enforce it or (3) unjust enrichment by Todd at the expense of the prospective passengers in the application by the shipowner of the passage money paid by them to the satisfaction of some part of Todd's claim; or that (4) the large amount of Todd's claim and refraining from promptly enforcing it, in some way, made Todd a co-owner or agent of the owner. The result of this contention, if successful, would not be to establish a right of the prospective passengers to participate pro rata or on any other basis compete with the other established maritime liens but, by excluding the large claim of Todd entirely, there would probab-

ly be left in the fund for distribution about $100,000 which, on general equitable principles, would be available for the passenger claims.

The several aspects of this contention were carefully examined by the Commissioner with respect to both the facts and the law. Shortly stated, he found that the facts did not support the contention. In this connection the principal facts with regard to Todd's activities or delay in libelling the ship were as follows. By November 12, 1946, the work of converting the ship for the principal utility of passenger transportation had been completed by Todd and its charges therefor aggregated $646,-105, on account of which it had been paid up to January 1, 1947, $150,000. In the last months of 1946 the ship made its first round trip to and from Europe; and during the intervals between the three subsequent voyages in 1947, Todd made further repairs and alterations to the ship from time to time at a charge of about $112,000 more. During 1947 and up to and including March 17, 1947, Todd received further payments amounting to $100,000 more. It was not shown in the evidence that any of these payments to Todd were derived from moneys paid by the prospective passengers for the fifth scheduled but not undertaken voyage. On June 13, 1947, one month before the libel, Todd did receive a payment of $10,000 cash as a credit on its bill, the payment having been made by a travel agency for account of the shipowner, and apparently pursuant to the insistent demand of counsel for Todd for some further payments on account of its bill. It is asserted by the proctors for the passengers that this latter payment came from their passage money; but this is denied by counsel for Todd and the evidence does not clearly solve the dispute. In any event it is not clearly established that Todd either demanded the payment of passage money or knew that the payment was from that source. It seems to have been rather a general payment on account by the debtor irrespective of the source of the particular funds, although it is quite possible that Todd may have suspected or inferred from the circumstances that the source was recently paid passage money.

Proctors for the passenger claimants emphasize the fact that Todd obtained from the shipowner various assignments and mortgages. Thus on November 9, 1946 there was assigned to Todd "freights" to be earned by the ship after deducting certain expenses and appointed Todd the attorney to collect and receive the same. Again on May 29, 1947 there was another assignment to Todd of the gross freights of the vessel and also those of another vessel owned by Hanioti, The Dimitrios, and "the proceeds of any sale" of the vessel to the extent of Todd's claim. Todd also took a mortgage from the shipowner corporation and Hanioti. But these several assignments and mortgage were expressed to be without prejudice to Todd's maritime lien which was reserved, although in the instruments it was recited that Todd was refraining from arresting the vessel at that time and permitting her to sail upon her then contemplated voyage. In connection with the last mentioned transaction, Todd also apparently attempted to obtain delivery of Hanioti's stock in the shipowning corporation, but the latter attempt was unsuccessful and the stock apparently would have been worthless anyhow.

It will have been noted that the assignments were of all the "freights" to be earned by the ship. Counsel for the passengers and Todd respectively are in disagreement as to whether the term "freight" used in the assignments was broad enough to include "passage money" as well as payments for cargo, Todd contends that there is a distinction between "passage money" and "freight" to be earned for cargo in common usage in the trade, and points out that Todd in fact did not construe freight to include passage money and made no effort at any time to collect passage money from the agencies who sold the tickets for Todd or from Hanioti directly. On the other hand, it seems to be recognized, at least in some of the cases, that the term "freight" can be used as inclusive of passage money also. The Main v. Williams, 152 U.S. 122, 131, 14 S.Ct. 486, 38 L.Ed. 381.

But however that may be, after a full consideration of the evidence, the Com-

missioner held that there was no proper basis for disallowance of the Todd claim as a maritime lien either with respect to the other lien claims or the passenger claims. As to alleged fraud by Todd, it is sufficient to say that the Commissioner found no evidence whatever to support the charge. As to waiver by Todd of its maritime lien for construction and repairs, the evidence seems clear that the express intention of Todd was to retain the lien, and its delay in enforcing it, only eight months, was not of itself sufficient in time to warrant an inference of abandonment by laches. And as to suggested unjust enrichment by Todd at the expense of prospective passengers, the evidence did not justify a finding to that effect. Nor did Todd's conduct constitute any relation of agency or ownership with respect to the ship.

The Commissioner reviewed and considered and found distinguishable three cases especially relied upon to support the passengers' contention. New York Dock Co. v. Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955; Fosdick v. Schall, 99 U.S. 235, 25 L. Ed. 339; Silva v. Bankers Commercial Corporation (The Constellation), 2 Cir., 163 F.2d 602, 1947 A.M.C. 1266. In summary he said in his report (p. 79)—

"an examination of the record in the present proceedings, has not convinced the Commissioner that Todd went any further in its dealings with the vessel owner than to exert every pressure it could to collect its debt and to preserve its lien therefor, and that such course of dealings did not go to the extent of either controlling the vessel's operations or in creating any principal-agent relationship with respect thereto. In addition, of course, the element present in the cases quoted from—viz unjust enrichment at the expense of the passenger claimants—is not only not proven but, as before stated, cannot be found to exist from this record."

And finally the Commissioner held as a conclusion of law that the passenger claimants had not presented claims which were enforceable in the admiralty proceeding, and that Todd's exceptions thereto must be sustained, without prejudice, however, to such claimants pursuing any remedy as they may be advised against Todd or any other party looking to the recovery of the losses which they have sustained. And reference was made to certain litigation which had been undertaken (so far apparently unsuccessfully) by some of the passenger claimants in New York courts.

■ I concur in this conclusion of the Commissioner. Counsel have not satisfied me that it is erroneous. In this connection and with reference to this and other exceptions to the Commissioner's report, it is to be noted that the proper approach here must be in accordance with Supreme Court Admiralty Rule 43½, 28 U.S.C.A., which provides that the report of the Commissioner shall be treated as presumptively correct and subject to review by the court and that the court may adopt the same, or may modify or reject the same in whole or in part when the court, in the exercise of its judgment, is fully satisfied that error has been committed. The principle was also well established even prior to the announcement of the specific rule in 1932. Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; The Elton, 4 Cir., 83 F. 519.

■ The second question of general importance arising on the exceptions relates to the *marshalling of maritime liens*. The applicable law is to be found in judicial decisions, and is not controlled by any federal statute.[1] With respect to the rank-

---

[1] In this connection it is to be noted that the Act of June 5, 1920, c. 250, § 30, subsection P, 41 Stat. 1005, 46 U.S.C.A. § 971, provided that persons furnishing repairs and supplies to any vessel by authority of the owner or authorized agent "shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." But by subsection S of the same section 30 of the Act, 46 U.S.C.A. § 974, it was further provided that while the lien might be waived, this chapter "shall not be construed to affect the rules of law existing on June 5, 1920, in regard to (1) the right to proceed against the vessel for advances, (2) laches in the enforcement of liens upon vessels, (3) the right to proceed in personam, (4) the rank of preferred maritime liens among

ing of liens of different classes, the judicial decisions, while not entirely uniform, are substantially in accord. The law was conveniently summarized in this court by Judge Coleman twenty years ago in the case of The William Leishear, D. C., 21 F.2d 862, 863. There the ranking of liens of different classes was stated to be respectively as follows: "(1) seamen's wages; (2) salvage; (3) tort and collision liens; (4) repairs, supplies, towage, wharfage, pilotage, and other necessaries; (5) bottomry bonds in inverse order of application; (6) nonmaritime claims." In the instant case there are several classes of liens including seamen's wages, a tort claim, and liens for repairs, supplies and other necessaries; but as the case presents no controversy with respect to the preferred payment of seamen's wages and the tort claim, the only question of priority of payment arising with respect to the claims for repairs, supplies and other necessaries, all of which are claims of the same class and rank. But, as the fund for distribution is insufficient to pay all of them in full, there is necessarily involved here the question where the line is to be drawn between those claims of this latter class.

On this point it has sometimes been said that the judicial decisions are in confusion; but an examination of very many cases leads to the conclusion that this statement is correct only insofar as it is applicable to other than ocean voyages of ships. The rule originally developed in admiralty law and still the basic rule is that maritime liens of the same class are entitled to priority of payment in the inverse order of the time of accrual and that therefore liens arising in connection with the last voyage of the ship have priority of payment over liens accruing on a prior voyage. The rule was thus expressed by Judge Brown in the well-known case of The Proceeds of the Gratitude, D.C.N.Y. 1890, 42 F. 299, at page 300—

"The general maritime law adjusts all liens by the voyage. * * * By the general rule * * * the priority of liens continues only till the next voyage. The liens connected with every new voyage start with a priority over all former ones after the ship has sailed, if there has previously been opportunity to enforce them."

See also generally Robinson on Admiralty, p. 425; Benedict on Admiralty, Vol. 3, s. 465; The St. Jago de Cuba, 22 U.S. 409, 9 Wheat. 409, 6 L.Ed. 122; The John G. Stevens, 170 U.S. 113, 18 S.Ct. 554, 42 L.Ed. 969; 33 Yale Law Journal, 841 (1924); The Interstate No. 1, 2 Cir., 290 F. 926, 934, certiorari denied 262 U.S. 753, 43 S.Ct. 701, 67 L.Ed. 1216; The Steam Dredge A, 4 Cir., 204 F. 262, 264.[2]

Cases which have departed from the "voyage" rule will be found, without exception I think, to have related to ships engaged in other than ocean voyages, as for instance, harbor tugs, coastwise vessels, transportation on the Great Lakes, and comparatively small craft plying local waters. The voyage rule contemplates that at the end of each voyage liens that have arisen during its course should be promptly enforced before the ship departs on another voyage, if there is opportunity to the claimant to so enforce it by libel. As indicated in the opinion of Judge Smith for the Court of Appeals for the Fourth Circuit in the case above cited, the application of the voyage rule presupposes that the voyages are separated "by an appreciable length of time". While this is necessarily still true with respect to transatlantic or other similar ocean voyages, it is obviously not so with respect to the much shorter and more frequent voyages of harbor craft and merely coastwise vessels or other comparatively local transportation. To meet the necessities of such particular local conditions and to accord with the customary business practice locally pre-

---

themselves, or (5) priorities between maritime liens and mortgages, other than preferred mortgages, upon vessels of the United States."

[2] Other earlier cases approving the voyage rule are The Melita, D.C.Md., Fed.Cas., No. 6,218; The Omer, D.C.Va., Fed.Cas., No. 10,510; The Fanny, Fed. Cas., No. 4638; The America, Fed.Cas., No. 288; The J. W. Tucker, D.C., 20 F. 129, The John J. Freitus, D.C., 252 F. 876.

vailing it has been found necessary to substitute a rule of priorities other than the voyage rule, and the tendency seems to have been to adopt, as the period allowed prior to the filing of the libel for preferential claims arising therein, a period which can be regarded as a reasonable time for the extension of credit. Thus for New York harbor craft, that period has been fixed at 40 days, and in Puget Sound at 90 days; while on the Great Lakes, where the rigor of winter generally interrupts navigation, the period has been fixed as the navigating season, and thus claims arising during such a particular season are preferred over those of a prior season. More recently, apparently by analogy to this so-called season rule, a rule of priority has been applied by which liens arising in a particular calendar year are given priority over those arising in a prior year; and in a number of cases this latter rule, the so-called "calendar" year rule, has been applied to vessels engaged in coastwise commerce. The Interstate No. 1, supra, 290 F. at page 934. About twenty years ago, in a series of three cases in this court, Judge Coleman applied this latter calendar year rule to small craft locally engaged. While there seems to be no case in the Supreme Court dealing with this particular subject, it seems clearly established in the First Circuit (The Interstate No. 1, supra, 290 F. at page 934) that the voyage rule still applies with respect to "vessels engaged in commerce on the ocean." And it is, I think, likewise, the rule announced in this Fourth Circuit in the case of the Steam Dredge A, 204 F. 262, 264, although on what appears to have been a factually unsatisfactory record, the rule actually applied in the case of a ship apparently engaged in coastwise trade was the so-called calendar year rule.

In the instant case the Commissioner's report expresses his preference for the *voyage* rule but actually applied the *calendar year* rule. It is important, however, to note that in doing so he found that in effect both the voyage rule and the calendar year rule would produce the same actual result with respect to payment of the liens. This was true because the ship made four voyages, one in the latter months of 1946 and the remaining three in 1947; and the fund for distribution was sufficient to pay in full all the allowed lien claims arising in 1947, leaving a balance for a percentage distribution of less than 10% to the lien claims arising in connection with the first voyage in 1946. It was, therefore, unnecessary in applying the voyage rule, to distinguish between claims arising on the second, third and fourth voyages as to respective priority. In particular figures the Commissioner thus allowed for prior payment claims for supplies and other necessaries arising on the last three voyages in the aggregate amount of $291,921.68, all to be paid in full from the fund, while those arising in 1946 and to be deferred to the former amounted to $423,950.13, of which the balance due Todd Shipyards represents nearly 90%.

Counsel for Todd and the few other claimants whose liens arose in connection with the first voyage, vigorously protest the correctness of the classification made by the Commissioner. In the first place they point out that in the cases applying the so-called calendar year rule the expression sometimes used by the court is the "year" rule and that, therefore, the period of time referred to should be considered a twelve-month period preceding the date of the libel; but as to this an examination of most if not all of the cases referred to shows from the facts involved that claims allowed (with only trivial exceptions, if any) were those which arose during the calendar year in which the libel was filed; and I have found no case which establishes a twelve month period for the classification of preferred and deferred lien claims.

The next argument advanced is that by reason of changed conditions with respect to ocean voyages which are now generally of much shorter duration than when the voyage rule was established, and since means of communication between the owner and the master of the ship, possibly in a foreign port, are more rapid because of the facilities of cable and radio, the voyage rule should be regarded as obsolete and a different new rule substituted therefor.

In support of this contention particular reference is made to the view expressed by Robinson on Admiralty p. 427, in which that generally excellent author, after referring to the season rule prevailing with regard to shipping on the Great Lakes, and the 90-day rule for credit in navigation in Puget Sound said:

"It is questionable how much further the application of this principle can be carried and to what jurisdictions it extends. But it is sufficient here to point out that for short trips the voyage rule is no longer a test and has given place to rules in which there are local variances. Even where the longer voyages of ocean steamers are concerned, the courts have ceased to apply a technical interpretation of the term 'voyage' and talk in terms of years.

"The year is considered representative of the voyage. This shows a tendency, even in the case of larger vessels, to apply a time measured by a *reasonable period of credit* rather than voyage. Passenger liners today make the transatlantic run in less than a week so that the larger steamship companies in a certain measure are beset with the same problem which faced harbor craft at an earlier date. Judge Brown in The Gratitude ante, note 181, remarked of the 40 day rule: 'It accords in some degree with the period of modern (1890) voyages.'" (Italics supplied)

However, an examination of the four cases mentioned in the note documenting this view fails to show that any of them related to transatlantic or other ocean voyages. Two of the cases were among those decided some twenty years ago by Judge Coleman and which have been above referred to. They related to small craft locally navigating the Chesapeake Bay.

While counsel for the particular exceptants concede that there is no definite judicial authority in support of their contention they urge that, as the decided cases present such variable rules for determining priorities, some new and definite rule should now be established, and further urge that the new rule to be adopted should be the year rule as they contend it should be understood, that is, that all liens arising in a period of one year prior to the libel should rank pari passu; or, in other words, that the period of a year as "a reasonable period of credit" should be established as the test rather than that of the voyage.

My conclusion of law is that the voyage rule still prevails despite greater rapidity of transportation and communication. The reasons which originally gave rise to the voyage rule still exist even though their importance in some respects may have been lessened. Many ocean voyages are still of several months' duration and there is still at times the most imperative need that a ship in a port far distant from the owner should have the ability to obtain repairs and supplies on the credit of the ship itself. This ability to obtain such credit would obviously be much impaired if a long prior claim originating in connection with a previous voyage, as in this case, and amounting to a sum much larger than the sale value of the ship, were to rate equally with the supplies or repairs on the last voyage, imperatively needed to keep the ship a "going concern", and to enable it to return to its home.

But even if it were possible in the present state of the admiralty law upon the subject to substitute a period of reasonable credit for the voyage rule, I would not think that the period should be extended in time to cover lien claims of Todd and others contemporaneous therewith in this case, practically all of which arose even prior to the first voyage although presumably in connection therewith. The claim of Todd is an unusual one both in amount and its relation to the ship itself. The claim is for a rush job to convert a ship previously principally devoted to carrying cargo, to a ship designed more particularly for passenger traffic. In order to complete the job at the earliest possible date to take advantage of the then apparently existing demand for passenger traffic, the job was rushed and the cost thereby greatly increased. Todd's bill for this conversion ($646,105) exceeded the original cost of the ship then recently purchased by the Hanioti interests. Todd could, and perhaps wisely should, have demanded payment of the claim in large part if not wholly, before allowing the ship to leave its yards. Fur-

thermore Todd then or shortly thereafter realized that the collection of the claim was precarious because it demanded and received an assignment of the freights to be earned by the ship. Clearly Todd was in a favored position to follow and keep in touch with the Hanioti venture, and must have realized that the ship would need supplies and other necessaries in foreign ports to be obtained only or principally on the credit of the ship. Thus Todd tacitly accepted or at least acquiesced with knowledge in a situation which resulted in the ship incurring large subsequent bills for supplies in foreign ports. If it be assumed that Todd was reasonably justified in allowing the ship to sail on her first voyage without then enforcing its lien, it seems fairly clear that Todd again had an opportunity at the end of the first voyage, about January 1, 1947, to enforce its claim by libel. But as we say, this was again deferred until July 12, 1947 after the ship had made three more subsequent voyages and incurred further large expense bills. In these circumstances, in marshalling liens between Todd and his contemporary lienors and subsequent liens, the equities would seem to clearly favor the latter liens.

With regard to the argument that the court should establish a new rule with respect to priorities and lien claimants, it is sufficient to say that I would not feel warranted in doing so where, as I find, the voyage rule is still the established one for ocean voyages. Nor do I think this case presents in its factual situation a proper one for the establishment of the new twelve-months rule which is advocated. I will add that while I have concluded that the voyage rule must be observed here, I do not think, apart from it, the facts of the case would justify the application of the calendar year rule. If we were to disregard the voyage rule and accept in lieu thereof as a test, a reasonable period of credit, the facts of the particular case do not furnish an adequate basis for determining what this period should be. Should it be forty days as a possible inference from what Judge Brown said in the case of The Gratitude above quoted, or two months for a transatlantic liner, or six

months as the calendar year rule has in effect been applied by the Commissioner's report, or a year or at least eight months as contended for by the exceptants? While the calendar year rule, analogized to the season rule, may be fairly applicable to the smaller craft navigating locally only, the court is not in possession of sufficient information in this case with respect to conditions in general affecting transatlantic or ocean voyages to say what period of time should be regarded as reasonable. Change in the law in this respect and in the establishment of such a definite period, if to be made at all, should be made only after the fullest possible information of all relevant conditions which ordinarily could be brought to the attention of a legislative body with full powers of investigation. While it may be entirely appropriate and desirable for a court dealing with a particular local situation, as for instance affecting the New York harbor or Puget Sound or the Great Lakes or the Chesapeake Bay, to lay down a general rule that is locally applicable, it is a far more difficult and wider question to determine such a rule for ocean voyages which, in many cases, may involve navigation extending around the globe.

Finally it may be observed that the Commissioner's report intrinsically shows how carefully he has considered this important question. His determination is entitled to the presumption of correctness. After much independent consideration I have been unable to determine that it is erroneous in practical effect and for the reasons stated the exceptions to that part of the report which deals with priorities among lien claimants of the same class is approved and the exceptions overruled.

*Various particular claims and exceptions:* I proceed now to a consideration of exceptions to various individual lien claims. First, as to the tort claim of Markos Mamoujelos. (See Commissioner's mimeographed report, pp. 41 to 53.) This claimant was allowed $4,000 to be paid in full as a preferred claim. The claimant was a seaman who has also been awarded his full wages to December 8, 1946 by the Commissioner. He signed articles in New

York on October 13, 1946, at a monthly rate of $120, plus overtime at 70¢ an hour, and performed services until December 8, 1946 when he was injured at Istanbul, Turkey. While engaged in the performance of his duties he slipped and fell on some grease or oil which had been allowed to accumulate on the deck and as a result of which he had an apparently badly broken leg. No separate claim has been made for wages beyond those allowed, or for maintenance and cure. The claim as made is based on the unseaworthiness of the ship under the general maritime law. His proctor has excepted to the amount of the award on the general ground that it is an inadequate allowance for the injury sustained and also because the Commissioner's report shortly states that he felt that the claimant to some extent had been contributorily negligent, while, as contended by the exceptant, the evidence fairly considered does not show the existence of contributory negligence. At the hearing in court the Commissioner with regard to this particular claim verbally stated that he had "taken off very little" from the amount of the claim on this ground.

The report shows that the Commissioner has very fully and carefully considered this claim both on the law and the facts. As to the applicable law, the problem is one in conflict of laws. In his report the Commissioner says (p. 43) "We have, therefore, a case of a foreign national, who had been illegally residing in this country for approximately twenty years, signing articles on a Honduras registered ship owned by a Panamanian corporation and injured while in her service. In addition, the Articles which he signed provided that 'in the event of illness or accident or death resulting from ordinary causes while in service, the Owner's liability as regards treatment, maintenance and compensation is to be settled in accordance with the provisions of the Greek Merchant Marine Laws.'" The Commissioner has at very great length discussed the question of what law applies, that of Turkey where the accident occurred, that of Honduras, the registry of the ship, that of Greece as mentioned in the Articles, or

the American law. There was no evidence as to any foreign law. In somewhat similarly involved situations the federal appellate courts in different cases have reached different results. The Commissioner's report, (after noting the American law that the place where the injury occurred would govern when proved) states that as no foreign law had been proved in the particular case the question before him was whether it was proper to apply the general American admiralty law as to unseaworthiness of the ship. In several cases in the Second Circuit the plaintiff in such a situation, not having proved a foreign law, was not permitted to recover. The Hanna Nielsen, 273 F. 171, certiorari denied 257 U.S. 653, 42 S.Ct. 93, 66 L.Ed. 418; Bonsalem v. Byron S. S. Co., 50 F.2d 114; Ozanic v. United States, 165 F.2d 738. See also to the same effect in the Ninth Circuit, The Balymead, 88 F.2d 144 and The Petter Lassen, D.C.Cal., 29 F.Supp. 938. But in Heredia v. Davies, 4 Cir., 12 F.2d 500, 501, where, however, the tort occurred in an American port, it was said by Judge Parker, after holding that the district court had jurisdiction—

"Furthermore, in absence of proof to the contrary, the presumption is that the law of Peru with regard to the right of recovery is the same as the law of this country, the lex fori. The Scotland, supra [105 U.S. 24, 26 L.Ed. 1001]; Robinson v. Detroit & C. Steam Nav. Co., 6 Cir., 73 F. 883, 20 C.C.A. 86; Minor, Conflict of Laws, 532."

See also The Arizpa, 4 Cir., 63 F.2d 42; Hanna Nielsen, D.C.Wash., 25 F.2d 984, and the Ferncliff, D.C.Md., 22 F.Supp. 728, 736. The Commissioner's solution of this difficult problem was that the general maritime law giving a remedy under such circumstances is applicable. Naturally the Commissioner gave the greater weight to the decisions of this Circuit and while recognizing the problem as difficult, I naturally have the same opinion.

There were no exceptions filed to the allowance of the claim except those by the claimant who complains of the inadequacy of the award.

■ With regard to the amount of the allowance made by the Commissioner, I have carefully considered the evidence submitted to the Commissioner and the extended brief by Mr. Berenholtz, proctor for the claimant, especially in relation to the finding of some contributory negligence by the Commissioner and the circumstances of the accident and the extent of the claimant's injuries. In result, looking at the case as a whole, I am not satisfied that the amount of the award made is inadequate. I cannot say the Commissioner's finding as to some contributory negligence was clearly erroneous. The determination of the Commissioner was necessarily in the nature of a jury verdict. The claimant appeared in person before the Commissioner who had the opportunity to see and hear him and to observe his then physical condition. His proctor contends that the award should have been at least $10,000 or more and refers for comparison to awards of about that amount or more in several recent cases of seamen who had sustained leg injuries due to the ship's fault. The cases cited are the Peterson v. Pacific S. S. Co., 145 Wash. 582, 261 P. 115, (Admiral Dewey,) 1928 A.M.C. 545; Jackson v. Mitsui, 138 Wash. 124, 244 P. 385, 1926 A.M.C. 850; Seeley v. City of New York, D.C.N.Y., 1927 A.M.C. 1526; Jones v. Atlantic Refining Co., D.C.Pa., 55 F.Supp. 17, 1944 A.M.C. 787. But an examination of these cases shows that the injuries sustained by the respective claimants were much more serious and aggravated than in the instant case as found by the Commissioner. And it may also for comparison be noted that in the case of Heredia v. Davies, 4 Cir., supra, where the injury to the seaman resulted from unseaworthiness of a somewhat similar character, the Court of Appeals, after considering the amount of the award of $400 by the district judge, increased the award, on a cross-appeal, to the amount of $1,000 saying at 12 F.2d at page 501:

"It appears that nothing was allowed as compensation for pain and suffering, or for the element of permanent disability in the case. We think that the award should have included compensation for these, as well as compensation for lost time and expenses. The evidence shows that the injury was a very painful one, and that it was necessary that libellant submit to two operations, which, although of a minor character, added to his pain and suffering. Two physicians testified that there is some permanent impairment of the function of the arm resulting from the injury, one of them stating that libellant is permanently disabled to the extent of at least 10 per cent. of his ability as a result thereof. Taking all of the circumstances of the case into consideration, we think that libellant should be awarded $1,000 in full compensation for his injury, and the decree of the District Court will be modified accordingly."

■ This case was decided in 1926 and it is common knowledge that changes in economic conditions have occurred since then which fairly justify more liberal allowance in personal damage cases at the present time. However, looking at this particular claim as a whole I cannot say that the amount of the award as determined by the Commissioner is sufficiently inadequate to justify sustaining of the exceptions thereto, which are therefore overruled.

*Claims of Various Seamen:* The report and the schedules filed with it list in itemized detail the names of the members of the crew and the separate categories in which their claims were considered and the amounts allowed or disallowed respectively. In general it appears from the report that the Commissioner not only has considered each and all of the claims carefully and fully, but the allowances made seem to evince liberal rather than ungenerous treatment of the crew which consisted of about a hundred men. The members of the crew, with little exception, all were represented by Mr. Berenholtz as proctor. Their claims are classed in the report in nine separate categories being for (1) straight wages including overtime and bonuses; (2) penalty wages under 46 U.S.C.A. § 596 for delay in payment of earned wages; (3) one month's extra wages claimed for wrongful discharge for those seamen who had not earned one month's wages as of July 12, 1947 under 46 U.S.C.A. § 594; (4) an additional one month's extra wages for the wrongful discharge of certain mem-

bers of the steward's department in accordance with an alleged agreement made May 27, 1947 (Wage Ex.No. 27); (5) repatriation expenses of alien seamen; (6) wages claim for skeleton crew from July 12, 1947 to July 22, 1947, the latter being the day upon which the court signed the order authorizing the court to employ a skeleton crew; (7) maintenance and cure claims and wages relating thereto; (8) personal injury claims; (9) miscellaneous items not otherwise classified including advances by the crew to the vessel.

At the hearing in court Mr. Berenholtz expressly waived some of the exceptions, specifically (a) all repatriation expenses for alien seamen; (b) specific individual claims of John Zarpas the purser, and (c) the claim of George Nicolopoulos, a provision master, and one Stynen. The personal injury claim has been previously discussed. (There were no exceptions filed with regard to maintenance and cure claims). Claim for penalty wages, that is two days' extra wages for delay in payment under 46 U.S.C.A. § 596, was not allowed by the Commissioner for the reasons stated in the report; and the exceptions thereto were not seriously pressed in oral argument although I do not understand they were expressly waived. The statute provides "every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court;". (Italics supplied) The failure to pay the wages in this case was, as appears from the report, due to the arrest of the vessel and the financial inability of the owner to make payment. There was ample evidence to justify the Commissioner in concluding that this constituted "sufficient cause" for the delay in payment.

The report disallows claims for all wages and overtime to eight members of the crew whose names are starred in Schedule A–1 (a), on the ground that the United States Immigration Department ordered that they should be detained aboard the ship at Baltimore but nevertheless these men left the ship and apparently their present whereabouts are unknown and they did not personally appear and testify before the Commissioner. The report, however, allows the claims for straight wages and overtime for all other members of the crew whose names appeared on the ship's crew list as testified to and produced by the purser. As to the wages of the eight disallowed, further reference thereto will be made hereafter in discussing the claim of the Panamanian Lines, the purchaser of the ship.

I will now deal with exceptions filed by Mr. Berenholtz to the disallowance of certain of these claims. A portion of the claim of Rene Ceusters was for $500 which was alleged by him to have been a portion of his regular wages which had been paid to him in the form of a check which was never cashed because it was valueless. The Commissioner, however, found that the $500 check had been given to this claimant as a bonus under circumstances not entitling him to a lien therefor and not as a portion of his regular wages and disallowed his claim therefor. The claim is fully discussed in the Commissioner's report and for the reasons therein given the exceptions will be overruled. Exceptions were filed on behalf of George Routsos and 24 other members of the steward's department for failure of the Commissioner to allow them two months' extra wages instead of only one month's extra wages. Their claim was based on an alleged written contract made in Greece, of which the original was unavailable but a translated copy produced, purporting to promise these men two months' wages if discharged without just cause or proper reason, in addition to their regular salary, and stated to be treated not as a penalty but as liquidated damages. The agreement was dated May 2, 1947 while the vessel was engaged on the third voyage. But for the fourth subsequent voyage these and other members of the crew signed Articles which did not contain the provision for two months' extra wages. These claims were fully and carefully considered both as to the law and facts on pages 24 to 28 of the mimeographed report. The Commissioner considered the evidence of the contract it-

self, the original not having been produced although full opportunity therefor was given, to be unsatisfactory and its interpretation with respect to duration to be uncertain in import, and in any event as a contract it was superseded by the later signed Articles for the fourth voyage. He also took the view that under the wording of the contract itself the condition on which the two months' extra wages were to be paid did not occur in that the condition was so closely like that in the statute, 46 U.S.C.A. § 596, regarding two days' extra pay, that it should be similarly construed and applied. In this connection the Commissioner thought that the reasoning in Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696, was more directly applicable to the present case than the holding by Judge Soper when District Judge in the case of the Fort Gaines, D.C.Md., 18 F.2d 413, 1927 A.M.C. 655. I concur in the conclusion of the Commissioner on this point and this exception is therefore overruled.

■ *Claim of Panamanian Lines:* The ship arrived in Baltimore on July 12, 1947. After the ship had been arrested by the Marshal under the libel, the local Immigration Service gave a formal written notice under section 20 of the Immigration Act of 1924, 8 U.S.C.A. § 167, to the local agent of the ship, The Terminal Shipping Company, and to the master to detain these men on board the ship. The agent endeavored to comply with this detention order by placing guards on the ship, but nevertheless these men escaped or otherwise left the ship and their subsequent movements and present whereabouts are unknown. The Act referred to requires that after such effective notice the men must be detained on board the ship, and for breach of the order a fine may be imposed in the amount of $1,000 for each seaman allowed to escape, and enter this country. The statute, subsection (a), provides "no vessel shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the collector of customs." The possibility of the levy of such a fine was apparently unknown to the Marshal and to the purchaser of the ship, the Panamanian Lines, at the time of the sale. Shortly thereafter when the ship was ready to sail under the new ownership, the local Collector of Customs refused to give it clearance. Thereupon the Panamanian Lines filed a petition in this court in the admiralty case to require the Collector to give the certificate of clearance on the ground that his withholding it was arbitrary and unreasonable as the ship had of course been sold free of liens. After hearing this matter it was held that the statute did not create a lien on the ship for the possible fines but nevertheless the court on the facts then before it did not find that the action of the Collector was arbitrary or unwarranted under the statute. It was further pointed out that the purchaser could secure clearance by depositing $11,000, the amount of the prospective or possible fines, and could thereafter file a claim in the case for consideration with respect to a possible abatement of the purchase price if the fines were ultimately imposed. D.C., 73 F.Supp. 362. Pursuant thereto the purchaser did make the deposit of $11,000 and subsequently filed a claim for that amount in the libel case asking reimbursement therefor from the proceeds of sale if the deposit were not in due course refunded. The United States also filed a claim for the payment of the fines from the fund in court. The Commissioner has disallowed both claims and exceptions have been filed by both claimants. However, at the hearing in court the Assistant United States Attorney representing the government's claim, stated that it would not be pressed; but as the deposit has not as yet been returned to the Panamanian Lines it has not abandoned its exception. Nevertheless I have concluded that it must be overruled for the reasons now to be stated.

The Terminal Shipping Company, the agent of the ship, by its counsel Mr. Stevenson Masson, has vigorously resisted in the administrative process the proposed imposition of the fine, with the result that on November 29, 1948 the Commissioner of Immigration has determined that the fine should not be imposed. I understand that

this constituted a final decision and that in due course the deposit will be returned, on orders of the Secretary of the Treasury. The court and proctor for the Panamanian Lines have been given a copy of an extended formal written opinion of this administrative decision which will be filed with the clerk in this case. The nine page written report of the Chief Examiner which I understand has been approved by both the Assistant Commissioner and the Commissioner of Immigration, reviews both the facts and the law of the case. It was pointed out that the formal notice of detention was not given until after the authority and control of the master and agent of the ship had been superseded by the seizure of the ship by the Marshal of the court and as the statute only required that the men be detained on board the ship, it would not be reasonable to impose the fine after the superior authority had passed to the Marshal.

Despite the effort of the agent of the ship to comply in good faith with the order of detention, by July 17, 1947, eight of the detainees had escaped from the vessel and by July 30, 1947, three more likewise escaped. The Commissioner disallowed wages for basic pay and overtime to eight of these detainees whose names appeared on the crew list as furnished by the purser. Presumably he was unable to identify on the crew list the three other detainees. He also disallows an extra month's wages to five of the eight just referred to, and also to one more of the detainees, for the same or other reasons. None of these men appeared before the Commissioner in support of their claims and there was no evidence offered by them to explain their apparent unexcused departure from the ship. In this situation the Commissioner was justified in inferring that they had entered this country unlawfully and that they had no proper standing in court to demand wages. It was apparently a reasonable inference that their action constituted in effect desertion of the ship disentitling them to wages under 46 U.S.C.A. § 701. It may also be said that in view of the circumstances their claim should have been disallowed on the equitable doctrine that they did not come into court with clean hands.

*Foreign supply claims* of (a) Gastaldi & Company, (b) Dracoulis, Ltd., and (c) Ginesta & Co. These claims are all for supplies and services to the ship in foreign European ports. The claimants were agents of the ship for certain ports respectively. The Commissioner has allowed the claim of Gastaldi in the amount of $8,200.99; of Dracoulis in the amount of $66,697.92 (of which, however, $9,133.17 is classified with claims accruing in 1946); and of Ginesta in the amount of $3,822. The Todd Shipyards, and certain passenger libellants, have filed exceptions to the allowance of each and all of these supply claims on the ground that the claimants were respectively "general agents" of the ship and therefore should not be allowed as lien claims. The Commissioner's report (pp. 109–111) fully discusses the applicable law in connection with the Gastaldi claim. He therein correctly states the general rule upon the subject to be—"a general agent does not have a maritime lien for advances made on behalf of a vessel, the presumption being that such advances are on the credit of the owner, which presumption, however, may be rebutted. A general agent, to establish a lien, must affirmatively prove an express agreement or circumstances justifying implication."

The difficulty lies not in the statement of the rule but in its application to the facts of particular cases. The decisions of the courts show very different results derived from variable facts. The Commissioner stated and considered the particular facts with regard to the relationship of these claimants respectively to the ship and the shipowner. He concluded that in each case the claimant was not properly classified as a general agent but was to be considered only a special agent. Todd's exceptions to the report were not orally argued at the hearing but have been quite fully presented in the brief of Mr. Skeen, its proctor. After giving independent consideration to the question, I have concluded that the Commissioner's decision was correct. As the same question occasionally recurs from time to time in admiralty cases, it may be useful to make some com-

ments upon the subject in addition to the quite satisfactory discussion of the matter in the Commissioner's report.

The problem in each case is to determine from the facts the scope of the authority of the agent in the light of the relationship between the principal and agent as expressed in the contract or agreement, oral or written, employing the agent, and interpreted in accordance with the established customs of the business. In the instant case we are dealing with a ship engaged in transatlantic service between the United States and six or more Mediterranean ports. The ship was of Honduran registry but practically its home port was New York, its real owner being an American citizen apparently conducting his main business in New York, and, as we have seen, having insufficient working capital. Obviously the ship required port agents at the various European ports. Of the three claims the activities of Gastaldi were clearly greater than those of either of the other two claimants. If the Commissioner's decision was right as to Gastaldi it was even more clearly so as to the others. The relationship of Gastaldi to Hanioti was in substance this. Gastaldi was employed by Hanioti to act as agent for the vessel at Genoa, Naples and Brindisi, Italy, but without any formally expressed contract. The vessel called at Genoa on four occasions, at Naples twice and at Brindisi once. Gastaldi was asked to handle the steamer for everything she needed in Genoa and Naples separately. He performed the customary services for the ship in getting her into and out of the ports, including the payment of harbor dues, pilotage, lighterage, stevedoring, provisions, fuel, water, taxes and other incidental and supervisory services. He collected outgoing freight and passage money and received cash payments from Hanioti crediting receipts to the account, expecting them to be sufficient to cover the expenses. He also represented Hanioti with respect to another ship, the Dimitrios, when she called once at Genoa. It does not appear that Gastaldi had any general control over the ship's movements or any authority to speak or act for her other than the necessary services for the particular ports.

While the decision is not free from all doubt, I think the better view is that Gastaldi should be classified as a special or local agent rather than a general agent, within the meaning of that term in the admiralty law. On the authorities the Commissioner in his discussion of the law points out that in this Circuit at least the most important cases to be considered are two decided by Judge Rose when District Judge, in one of which the Ascutney, D.C., 278 F. 991, reversed on other grounds, 4 Cir., 289 F. 802, it was held that the agent was only a special agent; while in the other, The Centaurus, D.C., 282 F. 883, affirmed, 4 Cir., 291 F. 751, he held that the agent was a general agent. It is clear enough that the general agent in the Centaurus had a much broader scope of authority in relationship to the owner than did Gastaldi to Hanioti. On the other hand, the authority of Gastaldi was apparently greater than that of the agent in The Ascutney. Therefore, as the Commissioner observed, the facts of this case place it in the somewhat uncertain territory between the two cases. To borrow a simile from artillery practice, we may say that these two decided cases bracket the target but they do not precisely locate it. However, a reference to the general legal principle of distinction between a general agent and a special agent will, I think, properly answer the question. The best statement of this distinction is to be found in the A.L.I. Restatement of Agency, s. 3, as follows: "A general agent is an agent authorized to conduct a series of transactions involving a *continuity of service*. (Italics supplied) A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service". The facts in the Centaurus clearly showed continuity of service of the agent who continuously for many years represented the owner with respect to a whole fleet of ships; while in The Ascutney the special agent was employed only in one port on one occasion. Gastaldi had some continuity of

service for the ship but only with respect to a few of the Mediterranean ports. His accounts with the principal were kept respectively with regard to the ship for each particular voyage. There was no general running account between himself and the principal as in the case of the Centaurus. While the claim of Dracoulis was allowed for a much larger amount the scope of its authority was very much more restricted in that it was engaged principally for the one particular purpose of supplying oil to the ship at various ports. Ginesta acted for the ship only at the port of Marseilles. As the facts in the separate cases are so variable it seems unnecessary to review them in the different cases as presented in the judicial decisions. However, the Commissioner does mention as supporting his view Dampskibsselskabet v. Oil Company, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197, which, he says, indicated, if it did not directly decide, that the potency of the "general agent" rule has been somewhat impaired if not eliminated by the federal lien statute which in terms gives the lien to "any person". There was no proof of foreign law prevailing in the Mediterranean ports where these supplies and services were furnished or rendered. Apparently all parties relied on the American statute as applicable, 46 U.S.C.A. § 971. Gastaldi complains that the Commissioner wrongly deducted the item of $3500 from the amount due him; but the report refers to the evidence on which the deduction was made and I am not satisfied that it was erroneous.

*Claim of Kambanis:* Nicolas Diamandi Kambanis was a provision supplier at Pyraeus, Greece, who furnished an amount of supplies to the vessel on her third and fourth voyages. His proctor presently claims that the net balance due for such supplies was 22,151,850 Greek Drachmas and that the proper rate of exchange therefor at the time was 5,000 Drachmas to the American dollar, to wit, in American money, $4,430.47. The Commissioner's report discusses this claim (pp. 122, 123). It allows the claim in the amount of only $843. The Commissioner concluded that this sum was proper on the basis that the net amount of Drachmas due was 8,000,000 and that the rate of exchange as found by him was 9500 Drachmas to the dollar.

The exceptant urges that the Commissioner's conclusion is against the evidence; but after consideration of this evidence I am unable to say that the Commissioner's conclusion was clearly wrong. It appears from the report that the principal reason that the Commissioner reduced the net amount of the claim in Greek Drachmas was his dissatisfaction with the claimant's proof. The claimant's first statement of the claim was regarded as insufficient and unsatisfactory and the Commissioner called attention of counsel to the unsatisfactory account and gave opportunity to supply more definite proof that would satisfy him with respect to the accuracy of the claimant's account. A second statement of claim was accordingly submitted but the Commissioner found it difficult to reconcile with the first. The Commissioner accordingly reached the best conclusion that he could to his own satisfaction in view of the inadequacy and uncertainty of the data supplied.

With regard to the applicable rate of exchange, there was a stipulation of counsel that it might be obtained by the Commissioner from recognized American trade publications. But apparently it was not possible to obtain the rate of exchange for the Greek Drachma at the applicable time from that source. Counsel for the claimant supplied an informal letter addressed to him by some one connected with the Chase National Bank of New York with an attached sheet purporting to have been obtained from a "Librarian" to the effect that the exchange rate was 5,000 Drachmas to the dollar. But the Commissioner evidently regarded this as insufficient evidence of the exchange rate, and on this point I am in agreement with his view. The Commissioner stated that on inquiry his best information was that the exchange rate was the figure that he adopted of 9,500 Drachmas to the dollar. Very possibly the situation may have been that at the times in question the exchange rate of Drachmas was so uncertain and

fluctuating that no very reliable figure could be obtained. In view of the uncertainties and inadequacy of proof as to this claim, my conclusion is that the exceptions must be and they are hereby overruled.

■ *Claim of George Nicolopoulos,* provision master. This claimant was an unusual type of member of the crew. He was employed by Hanioti to buy supplies for the ship. He was to be paid wages and also expected a commission but his proctor, Mr. Berenholtz, has waived any claim for commission. Apparently he was not paid any wages for the several voyages by Hanioti and they accumulated in amount. He also advanced the sum of $2690 to the purser on April 17, 1947 to pay the members of the steward's department their wages. For this advance and his unpaid wages the Commissioner allowed him $6,-366.68. This particular allowance is not seriously contested, (see Commissioner's report, pp.13–15) but in addition he made claim for the cost of supplies for the ship purchased by 'him and for which he was not reimbursed, in the amount of $9,263.85. This sum the Commissioner reduced to $8,063.85, after crediting on the claim $1200 said to have been collected by the provision master from the bar on the ship and turned over to Hanioti, and for which he took no receipt and which, it appears Hanioti states he did not receive. The allowance of this reduced amount of $8,-063.85 was excepted to by Todd and although the exception was not orally argued it has been fully discussed in one of Mr. Skeen's briefs. On the record there seems no adequate basis to challenge the fact that the supplies were procured and furnished to the ship by the claimant. But the somewhat unusual nature of his particular duties and other circumstances mentioned in the Commissioner's report evidently caused the latter to carefully scrutinize the claim and I have given it similar independent consideration on the record. The principal legal contention advanced in the exceptions is that the claimant had a special relation to Hanioti as a direct agent; that he looked to Hanioti for repayment and that therefore he should not be entitled to a lien. That he did expect to be paid by Hanioti personally is clear enough from the record; but the difficulty that the Commissioner had was thus expressed: "The Commissioner cannot on the basis of such general testimony destroy the lien in the face of the statute, unless there is evidence or logical inferences therefrom to show that the claimant had expressly agreed that the personal credit should exclude a lien. Benedict, Vol. 1 s. 89". On this point that well-known text book states:

"Under the Act of Congress it is not necessary to allege or prove that credit was given to the vessel. Prior to the Act, whatever was furnished to the vessel at the home port or on the owner's order was presumed to be furnished upon his personal credit and created no lien. The Act of Congress does more than declare the contrary presumption for, by force of the statute, the lien arises unless it is expressly agreed that the personal credit shall exclude the otherwise concurrent lien."

See also Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97; The Bronx, 2 Cir., 246 F. 809, and Ely v. Murray & Tregurtha Co., 1 Cir., 200 F. 368. I am therefore obliged, as was the Commissioner, to conclude that the allowance of the claim as a lien was not erroneous.

■ *The Commissioner's Compensation:* By request, the Commissioner appeared in court at the hearing and stated that he thought a reasonable fee for his services in the matter should be at least $10,000, plus disbursements not heretofore paid as costs of the case, in the amount of $280.08. He also stated that he had been personally occupied in the hearings and preparation of the report for 678¼ hours of time and in addition thereto his associates had spent 102½ hours in connection with the proceeding. He has since filed a brief written petition for a fee in substance repeating his oral statement at the hearing. The report itself affords intrinsic evidence of both the quantity and quality of the services performed. Numerous counsel present at the hearing at once cordially approved

the reasonableness of the allowance requested by the Commissioner, and it is accordingly allowed as a reasonable fee. An order to that effect has been signed and filed with the clerk, the amount to be paid as part of the administration expenses of the proceeding.

In the foregoing I have considered all of the exceptions that were either orally argued in court at the hearing or in any of the very numerous briefs submitted by counsel. I find no adequate basis for sustaining any of such exceptions and any others which have been filed but not argued are considered waived. I therefore finally conclude that the Commissioner's report as filed must be approved and all the exceptions filed thereto are hereby overruled. Presumably, before payment is made to the several distributees of the fund in accordance with the Commissioner's report (except as to payment of the Commissioner's fee which may be paid forthwith as a part of the costs of administration), interested counsel should prepare and promptly submit a more formal order or decree and they are requested to do so.