**P. T. PERUSAHAAN PELAYARAN SAM-UDERA TRIKORA LLOYD,**
Plaintiff,

Hapag Lloyd et al., Intervening
Petitioners,

v.

**T. S. SALZACHTAL et al., Defendants.**
No. 73-C-143.

United States District Court,
E. D. New York.

Feb. 25, 1974.

Delson & Gordon, New York City, for plaintiff; Alvin H. Meadow, New York City, of counsel.

Hill, Betts & Nash, New York City, for claimant Hapag Lloyd; New York City, Edwin Longcope, New York City, of counsel.

Healy & Baillie, New York City, for K & K Marine Corp.; Nicholas J. Healy, Jr., New York City, of counsel.

BARTELS, District Judge.

This is a contest among a mortgagee, charterer and an agent of the owner of a foreign vessel to determine priority of their respective liens. The action comes before the Court on objections to a Master's report imposing liens for alleged "necessaries" and seamen's wages prior to a preferred mortgage lien upon the foreign vessel "T.S. Salzachtal" which was arrested in the Port of New York and subsequently sold on March 14, 1973, for $375,000, pursuant to an order of this Court dated March 2, 1973. Up to March, 1973, the Salzachtal was owned by Nelson Seeschiffahrts-Agenture und Reederei Gesellschaft m. b. H. & Co. of Vienna, Austria ("Nelson"), who purchased the vessel from intervenor Hapag Lloyd AG ("Hapag"), who, in turn, took back a purchase money mortgage for $162,282.59, executed in Austria on December 21, 1971.

The issues are somewhat beclouded by the fact that a bizarre arrangement existed between Nelson and plaintiff P.T. Perusahaan Pelayaran Samudera Trikora Lloyd, Hamburg/Djakarta ("Trikora"), pursuant to which both executed on May 30, 1972, a charter party agreement entitled, "Uniform Time-Charter", and on May 31, 1972, also executed a "Confidential Agreement", dated May 9, 1972, which apparently cancelled and modified a number of provisions of the earlier charter party. Consequently, in construing the obligations and the relationship of the parties, certain difficulties of reconciliation and interpretation are presented. To these are added the complications caused by the financial instability of Nelson, resulting in the two

arrests of the Salzachtal and the final abandonment of Nelson's interest in the vessel.

Nelson and Trikora entered into a Time-Charter on May 30, 1972 for an unlimited time subject to cancellation in writing by either party, whereunder it was mutually agreed that the owners would let and Trikora as charterer would hire the Salzachtal, to be delivered at Hamburg, Germany. It was agreed, among other things, that the owners would provide and pay for all provisions, wages, insurance and all deck and engine-room stores, and also would efficiently maintain the vessel's machinery and hull, and that Trikora as charterer would pay as hire $1100 per day and would also pay for all port charges, pilotages, loading, unloading, stowing, delivery of cargoes and basically all other charges and expenses; that the Master would prosecute all voyages under the orders and directions of Trikora, who would advance to him "if required, necessary funds for ordinary disbursements for the Vessel's account" and further that the owners would have a lien upon all cargoes and Trikora would "have a lien on the Vessel for all moneys paid in advance and not earned."

This charter was substantially changed and emasculated on the next day, May 31, 1972, when both parties entered into a so-called "Confidential Agreement" covering the vessel. In the Confidential Agreement it was provided that the vessel would "perform one Indonesian Roundvoyage" and that Nelson would pay all stevedoring and port charges and all financial obligations arising from the roundvoyage of Salzachtal, in return for which Trikora would "abstain from claiming the total gross freights collected on all cargo carried during said Charter" and Nelson would have free disposal of all "gross freights" collected from the shipment of cargo.

Paragraph 8 of the Confidential Agreement stipulated that the charter party "is required for a formality only and not forming part of this Confidential Agreement unless in contrary with the general indemnity Clause as specified in point 12 a/b/c 1.2.3.4. Therefore Owners to indemnify Messrs. Trikora Lloyd for the complete wordings of the Charter Party. Any Claim resulting out of C/P is null and void." Paragraph 12 of the same agreement provided, in part, that Nelson would indemnify Trikora against:

"a) all operational risks and expenses arising out of the C/P;

b) all claims and unspecified risks;

c) Charterers' liability, such as:

1) entering vessel into P&I Club

2) Charterers' liability insurance;

3) Overage insurance payment;

4) all financial and operational consequences"

and that

"Trikora Lloyd under guidance of NELSON and in full coordination of both parties, will operate the vessel at the risk and expenses of Messrs. NELSON Seeschiffahrts-Agentur und Reederei GmbH. & Co. KG., Wein, the latter being considered to be the actual operators. Messrs. Inca- (as partner) Kamtoro Natadiningrat- will act as supervisory organization under separate agreement."

It further appointed Trikora as operator and provided that "wherever the word Charterers appears it is to be understood the Operators." To complete the arrangement provided by the Confidential Agreement Trikora was to receive 5% of the gross freights earned and in addition after costs were calculated in accordance with the specified formula, Trikora was to receive "extra compensation on a 50/50 basis." Finally, if both parties found the first roundvoyage satisfactory, further roundvoyages were to be considered and discussed "on vessel passing capetown homeward." This agreement was supplemented by testimony before the Master and by a subsequent agreement between the parties, dated December 7, 1972, from which it

became clear that the Master was Nelson's agent rather than Trikora's agent.

Sequence of Events

After the vessel had proceeded from Hamburg to Indonesia and then to several United States ports on the Gulf coast, it arrived in New York harbor in early January, 1973, when its troubles began. On January 25, 1973, wages being unpaid, twenty-two members of the crew arrested the vessel in order to recover $14,000 in wage claims. On the same day the relationship between Trikora and Nelson was severed when Trikora redelivered the vessel to the Master, who accepted the return on behalf of the owner. Within the next few days the crew's wage claims were satisfied and, accordingly, the vessel was released from arrest. This, however, was a short reprieve. Six days later the vessel was libeled *in rem* and rearrested on January 31, 1973 by Trikora, who sought to obtain through *in rem* relief payment of maritime liens for alleged prior advances for wages and other necessaries in the amount of $137,000. At the same time it sought *in personam* relief against Nelson and Heinz Bayer, manager and chief officer of Nelson, in an amount totalling $261,751.

On February 5, 1973, Universal Maritime Service Corp. ("Universal") was permitted to intervene in the action to recover sums owed it for stevedoring, terminal services and wharfage it provided the Salzachtal in New York. At a hearing before this Court on February 22, 1973, the Court, in order to preserve the business of the ship and in order to simplify matters, requested Trikora to pay Universal, which it did through payment to Universal by April 13, 1973 of the total sum of $114,453.50 for said services.

On March 2, 1973, Hapag, the mortgagee, and K & K Marine Corp. ("K &

K"), agents for Nelson, also intervened and asserted their claims against the Salzachtal. The owners being unable to post security to cover the claims, the Court on the same day with the consent of all the parties including the owners, ordered the United States Marshal for the Eastern District of New York to sell the vessel on March 14, 1973. Accordingly, the Salzachtal was sold at public auction for $375,000.

On May 30, 1973 all claims to the proceeds of the sale were referred to a Special Master, Magistrate Vincent A. Catoggio (Master), to take proof and to report his findings of fact and conclusions of law as provided in F.R.Civ.P. Rule 53, 28 U.S.C. Pursuant to the Master's first report, to which no objections were made, orders of this Court were entered directing payment out of the proceeds of the sale of the Salzachtal to fourteen crew members, Universal, All Ships Repair Co., and the United States Marshal, in the total amount of $83,318.80.

In his second report, dated August 27, 1973, the Master recommended allowances from, and preferred liens on the remaining proceeds of the sale of the Salzachtal in priority to Hapag, as follows:

| | |
|---|---|
| K & K Marine Corp. | $ 11,653.55 |
| World Travel Riese, etc. | 13,852.41 |
| Southern District Court Reporters | 1,173.50 |
| Trikora Lloyd | 107,349.75 |
| Hapag Lloyd | 162,282.59 |

The Master found that Hapag had a good and valid mortgage on the vessel, executed and recorded in accordance with the laws of Austria, in the amount of $162,282.59, and that the amount due on the mortgage exceeded the amount remaining for distribution among the claimants.[1] This finding the Court affirms as it does with respect to the

1. Nelson's attorneys, who first filed an answer opposing Hapag's claim on May 4, 1973, were permitted to withdraw from the action since Nelson failed to communicate with them after March 26, 1973. No one else appeared for them thereafter.

claims of World Travel Riese and Southern District Court Reporters to which no objections were interposed.[2]

The real dispute in this action is predicated upon the priority of the above liens accorded the various indebtedness ahead of Hapag's mortgage. The principal objections to the Master's report are addressed to the claims of Trikora and K & K. Hapag objects to the award of $107,349.75 by the Master to Trikora in subrogation for payments to Universal for a lien the latter possessed for providing the stevedoring, terminal services, and wharfage previously mentioned. Trikora excepts to the Master's report in that it claims to be entitled to additional prior liens totalling $59,060 in subrogation to (1) six alleged liens totalling $22,760 for services which were performed before the Salzachtal was arrested, but paid for by Trikora after arrest and (2) wage liens of $36,270 for work performed by the crew prior to November 30, 1972, and paid by Trikora on December 14, 1972, January 12, 1973, and January 24, 1973, respectively.

The total amount of liens claimed by Trikora, including the allowance by the Master, is $166,380.01. However, of the amount advanced by Trikora, only $139,393.07 remains unreimbursed, which represents the maximum amount recoverable by Trikora.[3] Hapag asserts that Trikora is not entitled to any liens for these advances, maintaining that Trikora's relationship to the Salzachtal and its suppliers prohibits the same. Similarly, for entirely different reasons, both K & K and Hapag object to the Master's report in awarding K & K a lien for $11,653.55 on the proceeds of the sale of the vessel. On its part, K & K insists that a lien should be allowed in the total amount of $53,075.72 for all thirty (30) items of expenditure, hereinafter considered seriatim, while Hapag maintains that the Master erred in making an award to K & K in excess of $703.55, representing seven non-wage items allowed.

I

## Applicable Principles

Congress specifically recognized the lien of a preferred mortgage on a foreign ship in 46 U.S.C. § 951, the pertinent provisions of which read as follows:

"A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in admiralty. Original jurisdiction of all such suits is granted to the district courts of the United States exclusively."

---

2. The claim of Bermar Inc. was disallowed in full and no objection was filed thereto.

3. Should Trikora fail to establish some of its claims as liens, it has the right to apply some of the reimbursements it received to the payment of these non-lien claims before applying the reimbursements to the claims entitled to lien status. Thus, if Trikora establishes its right to be subrogated to liens in any amount exceeding $139,393.07, it will be awarded that amount out of the proceeds of the Salzachtal. Compagnia Maritima La Empresa, S.A. v. Pickard (5th Cir., 1963), 320 F.2d 829, 833.
Trikora also seeks to increase its recovery by 11.1% due to the devaluation of U.S. currency that took place in October, 1973, citing Shaw, Savill, Albion & Co. v. The Fredericksburg, 189 F.2d 952, 954–55 (2d Cir. 1951). However, Trikora is not recovering for breach of an obligation owed to it performable in a foreign currency in the United States within the meaning of that case. It is simply a subrogee standing in the shoes of creditors who, except for the seamen, are Americans and who have rights to liens created in the United States, payable in U.S. currency out of a fund established by arrest and sale of a vessel in accordance with United States admiralty law. This 11.1% claim of course is denied.

In so doing, however, it also provided: " . . . That such 'preferred mortgage lien' in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States." 46 U.S.C. § 951.

In order to affix priority of the claims of Trikora and K & K, it becomes necessary to ascertain whether the indebtedness of these two claimants fall within the category of necessaries, entitling these claimants to a lien. To be read in connection with this section is 46 U.S.C. § 971, providing as follows:

> "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

█ Recently, courts have rejected a niggardly interpretation of the term "necessaries", reasoning that a broad interpretation better effectuates the intent of Congress to keep vessels actively in the flow of commerce, thus safeguarding the interests of the owners and secured parties and to maintain the superior position of American suppliers of goods and services to foreign vessels. Payne v. SS Tropic Breeze, 423 F.2d 236 (1st Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970); J. Ray McDermott & Co. v. Off-Shore Menhaden Co., 262 F.2d 523 (5th Cir. 1959). The most frequently used definition of "necessaries" is "what is reasonably needed in the ship's business." Walker-Skageth Food Stores, Inc. v. The Bavois, 43 F. Supp. 109, 110 (S.D.N.Y.1942); J. Ray McDermott & Co. v. Off-Shore Menhaden Co., supra; Layton Industries, Inc. v. The Gladiator, 263 F.Supp. 356 (D. Mass.1967). See Payne v. SS Tropic Breeze, supra.[4]

█ If Section 971 is read literally, "any person" furnishing repairs, supplies and other necessaries would be entitled to a lien. This, however, is not true. Another hurdle must be overcome. By judicial gloss, the courts have held that a part owner or a joint venturer with the owner, or a charterer who acts as a general agent of the owner has no such lien upon the theory that such persons are not strangers to the vessel who have relied on the security of the ship but have rather relied on the credit of the owner, Savas v. Maria Trading Corp., 285 F.2d 336 (4th Cir. 1960); Garcia & Diaz, Inc. v. Empressa Naviera De Cuba, 158 F.Supp. 147 (S.D.N.Y. 1958); Gardner v. The Dolphin, 208 F. 2d 116 (2d Cir. 1953); Compagnia Maritima La Empresa, S. A. v. Pickard, 320 F.2d 829 (5th Cir. 1963); The Maret, 145 F.2d 431 (3d Cir. 1944); and some authorities have held that such persons cannot be subrogated to the liens of others supplying such necessaries. Gardner v. The Dolphin, supra; The Maret, supra; Ray, Maritime Contract Liens, 47

4. In this case the Court, in interpreting the Ship Mortgage Act, 46 U.S.C. § 953, allowed as "other necessaries" under Section 951, the travelling expenses of the Master to secure funds from the owner for the operation of the vessel, stating:

> "We think that a broad interpretation is more consistent with the purpose of the Act than the earlier, narrow approach. . . . The appropriate test, therefore, is whether the goods or services in question were necessary to the continued operation of the vessel." 423 F.2d at 241.

Seizing upon the latter phrase, Hapag argues that any payment made for supplies or services after the ship was arrested could not possibly be used for the "operation of the vessel" and therefore could not fall within the category of "other necessaries". Such an interpretation was obviously never intended by *Payne* and, indeed, would reduce the definition of "necessaries" to mere mechanics of semantics instead of accomplishing the objective of the statute.

Tul.L.Rev. 587, 600 (1973); G. Gilmore & C. Black, The Law of Admiralty § 9–21. Others have indicated that if materialmen and those furnishing services to a vessel on the order of the charterer are entitled to a maritime lien, then the charterer or his agent is entitled to subrogation where he pays for the material or services. Rodriquez v. The G. K. Dauntless, 70 F.Supp. 958 (S.D.Fla.1947); The Atlanta, 82 F.Supp. 218, 235 (S.D. Ga.1948); Galatis v. Galatis, 55 F.2d 571 (5th Cir. 1932). In ascertaining who is entitled to a lien, we must also take into account 46 U.S.C. § 973, which provides that " . . . nothing in this chapter shall be construed to confer a lien when the furnisher knew . . . that because of the terms of a charter party, . . . the person ordering the . . . supplies . . . was without authority to bind the vessel therefor." There is nothing either in the original charter or in the Confidential Agreement prohibiting the charterer who orders services or supplies from binding the vessel. The claim here is that Trikora as charterer was a general agent for the owner, the nature of which is described by Judge Brown in Compagnia Maritima La Empresa, S. A. v. Pickard, *supra*, 320 F.2d at 832, in these words:

"The thing which characterizes a general agent as known in the maritime fraternity is a mutual interdependence on the financial credit and stability of each of the parties, agent and owner. The arrangement by its very nature contemplates that the agent must do many things in advance of the arrival or after departure of the vessel. Reimbursement of his expenditures and the payment of his fees, whether by commissions on freight or otherwise, is not dependent upon the profitableness of that immediate venture. Here, on the other hand, this was a single-shot affair in which none of the parties dealt on the *credit* of the others."

Although a general agent is presumed to have relied on the credit of the owner, such presumption may be rebutted by affirmative proof of "an express agreement giving him a lien or such circumstances as justifies the implication of one." The M. Vivian Pierce, 48 F.2d 644, 645 (D.Mass.1931), quoting The West Irmo, 1 F.2d 87, 88 (3d Cir. 1924); Compagnia Maritima La Empresa, S. A. v. Pickard, *supra*; Todd Shipyards Corp. v. The City of Athens, 83 F.Supp. 67 (D.Md.1949); Harmon, Discharge and Waiver of Maritime Liens, 47 Tul.L.Rev. 786, 793 (1973). There is a distinction between a general and a special agent. A special agent is limited both in his scope of authority and his relationship to the owner. As a rule, his function is to supply services or other necessaries to the vessel or to make advances to one who has supplied such necessaries. He does not rely upon the financial credit or stability of the owner but, instead on the credit of the vessel. Accordingly, he is entitled to a lien. Todd Shipyards Corp. v. The City of Athens, *supra*; The Ascutney, 278 Fed. 991 (D.Md.1922), rev'd on other grounds, 289 F.2d 802 (4th Cir. 1923); The Odysseus III, 77 F.Supp. 297, 300 (S.D.Fla.1948). Thus, in this case it becomes obvious that a maritime lien for services performed or supplies furnished to the Salzachtal in the United States, according to 46 U.S.C. § 971, will enjoy priority over mortgage liens on foreign vessels, such as Hapag, if reliance was placed upon the security of the vessel rather than the credit of the owner. Gilmore & Black, *supra*, § 9–70. This raises the question as to what portion, if any, of the payments made by Trikora and K & K were payments or reimbursements for necessaries and accordingly entitled to a lien status.

## II

### Trikora's Claims

**A. Subrogation for Payment to Universal—$107,347.79.**

With these principles in mind, we examine the claims of Trikora. We affirm the Master's report insofar as it relates to the award of $107,347.79 in subrogation to liens undisputedly possessed by Universal for stevedoring, terminal services and wharfage during the period January 3 to January 28, 1973. The Henry S. Grove, 285 Fed. 60 (S.D. Wash.1922). We make this finding upon the underlying premises that Trikora (1) was a special agent; (2) obtained a lien by express agreement with Nelson; and (3) relied on the credit of the vessel rather than on the credit of the owner.

### Special Agency

Upon the agency point, we believe that Trikora's relationship to Nelson is not to be viewed as suggested by Trikora or even as suggested by Hapag for other reasons, as of the time Trikora finally paid Universal for the latter's services, which was after the agency relationship had been terminated by redelivery of the Salzachtal to the owner, but rather as of the time Trikora obligated itself to Universal to pay the debt in January, 1973. See The Minnie and Emma, 21 F.2d 991 (D.Md.1927). Hapag correctly points out that Trikora was so obligated at the time Universal performed the services for the Salzachtal at Trikora's request, because Trikora was obligated under the charter party. Universal's rights, however, would not be affected by a confidential agreement of which it could have no knowledge, altering the terms of the charter party by making Nelson, rather than Trikora, responsible for stevedoring services. Hapag attempts to capitalize further on this idea by suggesting that, regardless of what the actual relationship was between Trikora and Nelson, Trikora was simply paying off its own debt and cannot recover for the reason that one is never entitled to be subrogated for payment of one's own debt. This argument fails to recognize that under the Confidential Agreement Nelson, and not Trikora, was required to pay for stevedoring and port services and therefore Trikora was in actuality paying Nelson's debt and not its own. To determine whether a lien exists on a vessel, the relationship of the parties to the vessel is the determining factor and not the relationship as it appears to third parties, such as Universal, assuming it appeared differently.[5] Cf. Findley v. Lanasa, 276 F.2d 907 (5th Cir. 1960).

In actuality, the relationship between Trikora and Nelson as established in the Confidential Agreement was clearly, it seems to us, a special agency. Construing the two agreements together, we conclude that the Confidential Agreement replaced what was essentially a charter-at-will with an agency relationship in which Trikora operated the vessel under Nelson's direction for a single-shot voyage, any continuation of the arrangement requiring an additional agreement. The testimony demonstrates that Trikora kept separate records for this voyage by Salzachtal apart from the records of its single voyage charters of the two other Nelson boats it operated, The Turbostar and The Inntal. The distinction between a general agent and a special agent is expressed in Todd Shipyards Corp. v. The City of Athens, supra, 83 F.Supp. at 88, and Restatement (Second) of Agency § 3 (1957), where it is said:

> "A general agent is an agent authorized to conduct a series of transac-

---

5. It is also for this reason that Trikora is not barred from obtaining a maritime lien by the fact that Trikora, and not Nelson, is named as carrier on the Salzachtal's bills of lading or by the fact that Trikora flew its houseflag on the vessel and painted its number on the ship's hull as specified in the Confidential Agreement.

tions involving a *continuity of service.* (Italics supplied) A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service". We find here that Trikora was not authorized to conduct a series of transactions involving continuity of service and accordingly was not a general agent.

■ Hapag asserts that since extra compensation was to be shared by Trikora and Nelson on a 50/50 basis, Trikora was actually a joint venturer. Such a provision, by itself, does not set up a joint venture. While an agreement for sharing of losses may not be indispensably essential to the finding of a joint venture, such a venture will not be easily inferred when such an understanding is absent, as was the case between Nelson and Trikora. Pan American Airways, Inc. v. Quilez, 154 F.2d 496 (5th Cir. 1946); Allen Chase and Co. v. White, Weld & Co., 311 F.Supp. 1253 (S.D.N.Y.1970). In the case at bar the entire transaction was to be conducted "at the risk and expenses of Messrs. NELSON [sic]". Further, the terms of the Confidential Agreement do not reveal any joint control between Nelson and Trikora characteristic of a joint venture. Trikora was to operate the vessel under the "guideance of Nelson", with the latter undertaking the full risk and expense and being considered the actual operators. According to the Confidential Agreement, Trikora was to abstain from claiming the gross freights which were, instead, to be at the "free disposal" of Nelson.

### Express Agreement

■ Assuming, as claimed by Hapag, that Trikora was a general agent or a joint venturer, Trikora nevertheless would be entitled to subrogation to Universal's maritime lien under an express agreement between Trikora and Nelson, granting Trikora a lien for advances. Paragraph 18 of the charter party unquestionably gave Trikora such a lien, even though the Confidential Agreement contained no similar provision. However, we believe paragraph 8 of the Confidential Agreement, quoted previously, incorporates paragraph 18 of the charter party into the Confidential Agreement. It seems to us that the only sensible meaning to be derived from the confusing and sometimes self-contradictory language of paragraph 8 of the Confidential Agreement is that whenever the charter party contains a clause contrary to the general indemnity clause in paragraph 12 of the Confidential Agreement, quoted previously, the charter party language is "a formality only" and any claim arising therefrom is "null and void". However, when language in the charter party does not contradict the clause requiring Nelson to indemnify Trikora for all operational risks and expenses, etc., then the charter party language becomes a part of the agreement between the parties. Paragraph 18 in no way contradicts the indemnity clause of paragraph 12, but rather harmonizes with that clause by giving Trikora a remedy through which to enforce it. Therefore, even under the somewhat stricter standard of depriving general agents of maritime liens, Trikora is entitled to such liens against the Salzachtal regardless of whether or not it was a general agent or joint venturer. Of course, under *Rodriquez,* and related cases, *supra,* Trikora would clearly be entitled to a lien since it made no agreement with the owner denying it the right to bind the vessel.

### Reliance on vessel

■ The testimony establishes that at the time the Salzachtal arrived in New York and Universal's services were procured, Nelson appeared financially unreliable, insolvent and unable to pay its bills. Afnan Swuwaskito, finance manager of Trikora in its home office in Jakarta, stated in answer to a question as to whether there came a time when

Trikora became concerned about the solvency of Nelson:

"Well, in the month of September [1972], many times we requested additional funds, but no response from the other side, so we ascertain that the company [Nelson] is not solvent any more, . . . ."

Accordingly, on December 7, 1972, an arrangement was made between Trikora and Nelson whereby Trikora agreed to advance money for Nelson up to a maximum of $162,000, while Nelson agreed to pay all crew wages including $25,000 then owing. But Nelson did not meet this obligation, whereupon the crew struck in New Orleans for four days. A representative of Trikora, one Moechtar Natanagara, testified that Nelson had insufficient funds to pay even the crew wages it had contracted to pay on December 7, 1972, much less any additional obligations. His testimony also disclosed that the crew of The Turbostar, another Nelson ship, had not been paid wages in December, 1972 or in January, 1973, resulting in the seamen's arrest of that vessel.

Finally, and most significantly, the crew of the Salzachtal was on strike from January 5 to January 17, 1973, while the ship was in New York. Thus, for most of the time Universal was performing the services for which Trikora had obligated itself to Universal, the crew was on strike for non-payment by Nelson, which culminated in the first arrest of the Salzachtal in New York on January 25, 1973, approximately the last day in which Universal performed the services represented by the present claim. We believe in light of these occurrences and Trikora's knowledge

thereof, that it strains credulity to hold that Trikora was looking principally to Nelson, rather than the ship, for reimbursement. See The Owego, 292 F. 403, 408 (E.D.La.1923). Trikora relied upon the credit of the vessel and is entitled to subrogation.

B. *Trikora's Additional Claims—$59,030.26*

*Six Payments amounting to $22,760.26*

The Master denied recovery to Trikora on all claims other than the one for subrogation to Universal's lien for $107,349.75.[6] The following six claims totalling $22,760.26 were disallowed by the Master:

| | | |
|---|---|---|
| 1. | N. Y. Shipping Assn. assessment | $ 8,026.38 |
| 2. | Airfare to repatriate three crew members | 1,809.00 |
| 3. | Transshipment of cargo to Boston | 8,661.91 |
| 4. | Extra labor for assorting cargo delivered in New Orleans | 1,826.00 |
| 5. | Drayage and stowage of cargo in Galveston | 2,070.97 |
| 6. | Survey of cargo in Galveston | 366.00 |
| | | $22,760.26 |

Since, as appears below, five of the above six items represent necessaries,[7] we find Trikora is entitled to be subrogated to the five items for the same reasons we allowed subrogation to the Universal lien. In both cases Trikora became obligated to pay those who performed these services at the time they were performed, which was shortly before the ship was arrested; in both cases Trikora did not pay the sup-

6. In doing so, he stated that "Trikora advancing money to the ship prior to its seizure in the instant proceedings occupied various roles as charterer of the vessel, operator of the vessel under 'confidential agreement', special agent and even general agent. In my opinion Trikora has failed to establish that when it advanced monies in connection

with the operations of the T.S. Salzachtal it did so under circumstances which gave rise to its acquiring of a preferred maritime lien." We believe this conclusion to be clearly erroneous.

7. We note that the Master made no finding on this question.

plier until after the arrest and finally in both cases Trikora was not responsible for payment of the item as between itself and Nelson.

We have examined each of these items and find that claims 2 through 6 were reasonably needed in the ship's business and are therefore "necessaries" within the meaning of 46 U.S.C. §§ 951 and 971 entitled to lien status to which Trikora may be subrogated. There is no merit to Hapag's argument that item 3, the transshipment of freight to Boston, could not be a "necessary" to the vessel because Trikora had already received payment for the freight and was obligated to deliver it to Boston under the bill of lading. Delivery of freight to the destination agreed upon is the normal function of a vessel, such as the Salzachtal, and expenses reasonably needed to perform that function are necessaries regardless of whether the freights are prepaid or not. The transshipment was necessary to permit the vessel to meet its freight delivery obligation without risking a delay that might be occasioned by the probability of another crew strike.

Item 1 is in a different category. The New York Shipping Association assessment, which is a fixed charge per ton of cargo unloaded, assessed by a private group of stevedores operating in New York City in order to finance a guaranteed annual income program for the benefit of its employees pursuant to a collective bargaining agreement with them, cannot be said to be reasonably needed in the business of the Salzachtal and is therefore not entitled to lien status.

*Wages to the Crew amounting to $36,270*

The Master denied Trikora recovery of $36,270 it advanced to members of the crew in payment of their wages.[8] Unlike the claims of Trikora previously considered, Trikora had not obligated itself to anyone to pay crew wages. In particular, under the charter party the owner was to "provide and pay for all provisions and wages." Therefore, in evaluating Trikora's right to be subrogated to the wage liens, we look at its relationship to Nelson and the vessel as of the dates of Trikora's payment of these wages, namely, December 14, 1972 and January 12 and 24, 1973, and not as of the time the crew became entitled to payment of wages from Nelson.

As previously noted, Trikora's relationship to Nelson on those critical dates was such as entitled it to subrogation to Universal's liens and likewise entitled it to subrogation to the liens of the crew for payment of wages. Here, there is an additional factor which supports Trikora's right to subrogation. At the time it took an assignment from the crew members before making the wage advances, and as to the January payments Trikora obtained an agreement from the Master "as representative and agent of the owner" to permit it to assert the rights assigned to it by the crew members.

We conclude, therefore, that Trikora is entitled to be subrogated to liens against the vessel in at least the amount of $139,393.07, which will be allowed from the proceeds of the sale in priority to Hapag's mortgage lien.

### III

### *K & K's Claims*

Intervenor K & K, maritime consultants and surveyors, interposed claims in the present action totalling $53,075.72 upon the ground that it is entitled to lien status under 46 U.S.C. § 971 and therefore under § 951 to payment out of

---

8. The wage claims originally totalled $48,370. However, after the Court discovered that $12,100 of this amount was for payment of the Master's salary, Trikora voluntarily reduced its wage claims to $36,270. While the Master of an American flag vessel is entitled to a seaman's liens for wages under 46 U.S. C. § 606, the Master of a foreign vessel is not. See Payne v. S.S. Tropic Breeze, 423 F.2d at 242-243.

the proceeds of the sale of the Salzachtal prior to foreign mortgagee Hapag. It has listed these claims as follows, which for convenience will be hereafter referred to by the index numbers opposite the payees:

| No. | Date of K & K Payment | Payee | Amount |
|---|---|---|---|
| 1 | January 11, 1973 | Esso for bunkers | $ 4,726.23 |
| 2 | January 15, 1973 | Cash advance to Master for crew | 10,000.00 |
| 3 | January 15, 1973 | Car hire | 145.00 |
| 4 | January 18– February 28, 1973 | Kosmos Transportation | 396.00 |
| 5 | January 23, 1973 | Messenger Service | 10.10 |
| 6 | January 23, 1973 | Global Service Bureau, Inc. for gyrocompass repair | 923.24 |
| 7 | January 24, 1973 | Golten Marine for pump repairs | 709.00 |
| 8 | January 29, 1973 | Advance to Mr. Bayer for crew | 1,000.00 |
| 9 | January 27, 1973 | Check to Indonesian Consulate for loans to crew | 6,094.20 |
| 10 | January 29, 1973 | Check to Haight, Gardner, Poor & Havens, fees for release of vessel | 1,800.00 |
| 11 | January 29, 1973 | Check to Delson & Gordon, settlement of crew claims | 3,035.00 |
| 12 | January 31, 1973 | Cash advance to Master for crew | 8,000.00 |
| 13 | January 31, 1973 | Golten Marine for repairs to fuel oil pipes | 262.00 |
| 14 | February 1, 1973 | BP for luboil | 219.95 |
| 15 | February 2, 1973 | Cash advance to Master for crew | 250.00 |
| 16 | February 5, 1973 | Advance to Mr. Bayer for crew | 1,000.00 |
| 17 | February 5, 1973 | Sandy Hook Pilots for shifting | 25.00 |
| 18 | February 6, 1973 | Advance to Mr. Bayer for crew | 3,000.00 |
| 19 | February 7, 1973 | Cash advance to Master for crew | 2,500.00 |
| 20 | February 9, 1973 | Seven Seas Supply Co. for stores | 113.00 |
| 21 | February 13, 1973 | Cash advance to Master for crew | 600.00 |

| No. | Date of K & K<br>Payment | Payee | Amount |
|---|---|---|---|
| 22 | February 14, 1973 | Transportation for Mrs. Bayer | 45.00 |
| 23 | February 15, 1973 | USDA Inspection | 53.60 |
| 24 | February 16, 1973 | Cash advance to Mr. Bayer for crew | 3,600.00 |
| 25 | February 20, 1973 | Dr. Haziris for medical treatment | 15.00 |
| 26 | February 26, 1973 | Dr. Hohmann for consultation | 15.00 |
| 27 | February 27, 1973 | K & K Invoice, as local agents, for: | |
| | | car hire | 72.00 |
| | | messenger service | 16.00 |
| | | car hire for Master | 18.00 |
| | | cash to Mr. Bayer | 30.00 |
| | | agency fees for 35 days | 1,400.00 |
| | | 39 crew members arriving/leaving | 630.00 |
| 28 | February 27, 1973 | K & K Invoice, as local agents, for: | |
| | | messenger service | 12.80 |
| | | fees for crew attendance | 95.00 |
| | | car hire | 173.00 |
| | | car hire to Consulate, etc. | 173.00 |
| | | car hire for crew to Consulate | 36.80 |
| | | postage and petties | 295.00 |
| | | misc., Xerox copies, etc. | 185.00 |
| 29 | March 3, 1973 | Dr. Hohmann for treatment | 20.00 |
| 30 | January/February, 1973 | Telephone, telex | 1,381.80 |
| | | TOTAL | $53,075.72 [9] |

———◆———

The Master, without elaboration in his report, permitted the recovery of items 13 through 26, excluding item 22, which involved payments amounting to $11,653.55 by K & K made after the Salzachtal was arrested the second time on January 31, 1973, pursuant to Trikora's seizure. However, not all items falling in this category were allowed by the Master and in the case of advances for wages (items 12, 15, 16, 18, 19 and 21) and payment to Dr. Hohmann for medi-

9. Since the time K & K filed its initial claim, it discovered that it had received from Nelson $7,531 which it had intended to apply to debts unrelated to the Salzachtal but which were in excess of those debts. Accordingly, K & K now seeks only $45,544 from the proceeds of the sale of the vessel.

cal services to the crew (items 26 and 29), some of the payments made after the seizure were allowed and others were not. Consistency in the application of the same legal principles requires modification of the Master's conclusions.

 To examine the propriety of K & K's claims, we are compelled, as in the case of Trikora, to look at the relationship of K & K to Nelson as spelled out in the record at the time supplies or services were ordered. It appears that before December 22, 1972, K & K's functions with respect to the Salzachtal were very limited. According to the uncontroverted testimony, K & K during that period acted as consultant to Nelson with respect to prices for supplies, repairs and services to its vessels, and also acted as a liaison between Nelson and its indemnity insurers in case of an accident to a crew member. The limited nature of this relationship was confirmed by the March 15, 1972 letter from Nelson to K & K, which specifically limited the scope of K & K's responsibilities to acting in the capacity of "special agents" to Nelson in the United States and Canada for one year from the date of the letter. According to Spiro Kopelakis, president of K & K, from December 22, 1972 until March, 1973, when the ship was sold under court order, K & K, in addition to its previous responsibilities, became "responsible for payments to the Master, to the crew matters, crew repatriation, medical matters to the crew, consulate matters of the crew, laundry; provisions; and port authorities," and in fact, on December 22, 1972 ordered fuel to enable the Salzachtal to proceed from Galveston to New York. The increased activities were performed only for the Salzachtal and only to enable it to proceed to New York from Texas and to service the vessel while in New York. Further confirmation that K & K were special agents appears from the fact that when K & K acted as general agents for any owner, it held itself out as such at its offices in New York. It did not do so with respect to Nelson. Therefore, we believe that no more than a special or local agency was created between Nelson and K & K. Todd Shipyards Corp. v. The City of Athens, *supra*, 83 F.Supp. at 87–89.

 Hapag challenges this conclusion on the ground that there also existed a separate agreement between K & K and Nelson, dated March 15, 1972, appointing K & K operating manager for Nelson ships calling at the United States and Canada with respect to Dow Chemical Corp. shipments which according to the testimony, meant that K & K "was responsible for making the stowage of cargo, Dow Chemical cargo into Nelson vessels, and checking again stevedoring bills and agencies." The appointment of K & K to perform such limited functions pertaining only to Dow Chemical shipments does not militate against the conclusion that K & K was not a general agent relative to shipments on the Salzachtal pursuant to an entirely separate contract. Additionally, Hapag insists that since K & K conditioned its advances upon a promise by Nelson to reimburse it within a short time, K & K obviously was relying on the credit of the owner. We disagree. The extraction of such a promise from Nelson was no more than an acknowledgment by Nelson of its indebtedness to K & K and was not intended as a release of its rights to be subrogated to liens as a special agent. K & K, having experienced the same difficulty as Trikora in receiving payments from Nelson and being aware of the crew strikes on the Salzachtal and the Turbostar, was also relying on the credit of the vessel when it made its payments. "It is well established that one who makes advances for necessaries may look to both the credit of the owner and the credit of the vessel, . . . ." Brock v. S. S. Southhampton, 231 F.Supp. 280 (D.Or.1964); Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920); Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940). Finding that claims 1, 6 and 7 were necessaries supplied before

the ship was arrested, we hold that K & K as a special agent relying on the credit of the vessel, is entitled to subrogation of liens for the same.

▪ In view of the fact, however, that some of the supplies and services were rendered to the Salzachtal while it was in *custodia legis*, rather than under a prearrest, a problem arises as to the imposition of liens. Generally speaking, the principles relating to imposition of liens for services and supplies rendered to the vessel before arrest are inapplicable for supplies and services rendered to the vessel after arrest, the result being that the law as to *custodia legis* liens "has reached a high point of confusion." Gilmore & Black, *supra*, § 9–11. But the general rule that no liens for services and supplies may be imposed against the vessel after arrest has been subject to judicial modification. In the interests of equity and justice, and to prevent unjust enrichment, the Court may permit custodial liens to be created and, if necessary, paid in priority to pre-custodial liens for such expenses which have contributed to the preservation of the ship in its custody. Gilmore & Black, *supra*, § 9–11; New York Dock Co. v. S. S. Poznan, 274 U.S. 117, 47 S. Ct. 482, 71 L.Ed. 955 (1927); Turner & Blanchard, Inc. v. The S. S. Emilia, 322 F.2d 249 (2d Cir.), cert. denied, 375 U. S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963). No such priority, however, will be granted where the custodial claimant did not rely on the credit of the ship, or where the claim has been belatedly asserted, Bassis v. Universal Line, S.A., 484 F.2d 1065 (2d Cir. 1973), which is not the case here. Returning to specific items, we concur with the Master in granting K & K *custodia legis* claims 13, 14, 17, 20, 23, 25 and 26, in that the services performed were necessary to the preservation of the vessel while under arrest and were agreed to by Hapag in its initial brief. Likewise, we see no reason for denying claim 29, which dif-

fers from claim 26 only as to the date of payment.[10] But we must deny claims 3, 4, 5, 10, 22, 27, 28 and 30 for K & K's failure to show with specificity the *use* made of the item or, where such use has been sufficiently shown, failure to prove that the *use* was one reasonably needed in the Salzachtal's business if the item was supplied to the vessel before arrest or was required for the preservation of the vessel if the item was supplied after arrest.

▪ The remaining claims (2, 8, 9, 11, 12, 15, 16, 18, 19, 21 and 24) totalling $39,079.20, relate to alleged advances by K & K for wages to the Salzachtal's crew. We recognize that seamen's wages have long been accorded top rank and at times characterized as sacred liens. The Atlanta, *supra*; Todd Shipyards Corp. v. The City of Athens, *supra*. But here K & K has been unable to demonstrate that the wage advances it made resulted in actual payment to specified seamen in specified amounts. For the lack of specificity, the claims are denied. "As stated in The Florine, 1927 A.M.C. 1717, 'the law is that when a party advances money to pay the wages of the crew of a vessel, or to pay supply and repair claims on a vessel, and asserts a lien against the vessel for such advances in a concursus proceeding as against third parties, he must prove with certainty that the money so advanced went directly to pay lien claims against the boat.'" Reconstruction Finance Corp. v. The William D. Mangold, 99 F.Supp. 651, 653 (E.D.N.Y.1951). See also The Englewood, 57 F.2d 319 (E.D.N.Y.1932).

The Court does have before it, however, sufficient circumstantial evidence to conclude that some of the moneys advanced by K & K were used to pay the crew wages. A telex communication dated January 16, 1973, from the Master of the ship indicated that he was compelled to pay the crew $6,000 for the second half of December, that he had re-

---

10. For obvious reasons, it would have been a safer procedure had K & K, before the services were procured, obtained a court order sanctioning payment out of the fund.

ceived $10,000 as an advance from K & K (item 2), that $6,000 was used to pay crew wages, leaving $4,000 for January. K & K's business records reflect that this particular advance was actually made to pay for crew wages. *Cf.* Findley v. Lanasa, supra. We therefore allow $6,000 of item 2 as payment for crew wages. We regret that we find no such business records supporting the payments represented by items 8, 12, 15, 19 and 20.

■■■ Items 9 (loan for crew wages) and 11 (moneys paid to attorneys for crew wages) are established by a type of evidence similar to item 2 inasmuch as those payments coincide identically with the items paid the crew pursuant to the order of this Court releasing the vessel after its arrest by the crew for the sole purpose of recovering wages owed them. Persons advancing sums to the Master to pay crew wages are entitled to a maritime lien of the same rank. *The Englewood, supra.* Consequently, items 9 and 11 are allowed as a wage lien. No sufficient evidence having been adduced to show that any other payments made by K & K were used to pay wages, no additional allowances will be made.

■■■■ K & K insists that there should be an additional allowance, because the order releasing the vessel stated that $5,463.79 had been paid to the crew by the owner and that these funds must have come from K & K advances —item 2 (the remainder of $4,000 not used to pay December crew wages) and item 8 ($1,000).[11] K & K also argues that the crew wages were shown to be

roughly $3,000 a week in the second half of December, that the crew must have been paid for the six weeks covering the second half of December and all of January, and that no one other than K & K represented the owner for such payments, and that therefore K & K was entitled to at least $18,000 for payments to the crew. This may be a permissible inference from the circumstances but a permissible inference is not proof. To be entitled to priority over other claimants, K & K must demonstrate more affirmatively that its funds were specifically used to pay the crew for six weeks. Even accepting the circumstantial evidence from the telex that the crew cost $3,000 a week during December, it must be shown that the costs of the crew continued the same after the ship came to New York in January, throughout the crew strike that occurred during January and after the ship was arrested at the end of January.[12]

We, therefore, award K & K $15,129.-20 for wage advances which added to the previous allowance makes a total of $22,211.22, to be paid out of the proceeds of the sale of the vessel. Since the reversal and modification of most of the Master's findings are predicated upon a different application of legal principles, we are not hobbled with the "clearly erroneous" requirement. To the extent, however, that any of the foregoing findings and conclusions involve a reversal or modification of the Master's findings of fact, they are hereby held to be clearly erroneous.

So ordered.

11. Since there is no specific evidence tracing the delivery of these advances to the crew, the Court is not in a position to allow them. Furthermore, it is obvious that some other funds must have been used to make at least part of the payments, since the total of available K & K funds from items 2 and 8 was only $5,000, which was insufficient to cover the total payment of $5,463.79.

12. K & K could have protected itself by obtaining records from the owner at the time it made the advances or by obtaining assignments of the wage liens for the crew as a condition for making the advance as Trikora did or by obtaining Court orders where *custodia legis* wage liens were involved.