**AMEEJEE VALLEEJEE AND SONS**

v.

**M/V VICTORIA U. et al.**

**Civ. No. Y–80–568.**

United States District Court,
D. Maryland.

Dec. 4, 1980.

John H. West, III, and M. Hamilton Whitman, Jr., Baltimore, Md., for plaintiff.

Donald A. Krach, and Robert P. O'Brien, Baltimore, Md., for claimant, Beryl Shipping, Inc.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

This *in rem* action was filed by Ameejee Valleejee & Sons [Ameejee], a Pakistani partnership engaged in the business of providing agency services to vessels calling at the Port of Karachi, against the M/V VICTORIA U. [EX. PISHTAZ IRAN, and hereinafter PISHTAZ IRAN], a vessel currently owned by Beryl Shipping Company [Claimant] and formerly owned by Iran Express Lines [IEL]. Plaintiff seeks to recover for services and monies advanced by Ameejee for the benefit of the PISHTAZ IRAN during a port call in April/May of 1979. The Uiterwyck Corporation [Uiterwyck] was, at all relevant times, the shipping manager for the PISHTAZ IRAN as well as the United States general agent for all IEL vessels calling in the continental United States. Uiterwyck is currently the shipping manager for Claimant. There is a great degree of overlap between the principal stockholders of Uiterwyck and the principal shareholders of Beryl Shipping.

The evidence adduced at trial establishes the following facts. On August 1, 1974, a contract was entered into between IEL and Ameejee whereby Ameejee agreed to act as IEL's "exclusive agent" for the provision of "berth services" in Karachi. Plaintiff Exhibit # 1. Plaintiff occupied a similar agency position with respect to the South Shipping Lines, the corporate predecessor of IEL, from 1972 until 1974. Pursuant to this 1974 agreement, Ameejee performed a number of services for twelve IEL vessels, including the PISHTAZ IRAN. These services included collecting freights, advancing monies for necessaries, arranging for supplies and provisions, providing stevedores, booking occasional cargoes, dealing with the local Pakistani government, and assisting with other miscellaneous items. Ameejee was not authorized, however, to perform dry–docking services, schedule vessel itineraries; or indeed, provide any vessel services outside the Port of Karachi. Nor did Ameejee obtain a financial interest in IEL or in any of its vessels. On numerous occasions the services actually rendered to IEL vessels were furnished by Ameejee at the express command of Uiterwyck. All scheduling decisions respecting IEL vessels, including when and whether these vessels would call in Karachi, were also made by Uiterwyck. Uiterwyck made the arrangements for ship repairs, non–routine cargo bookings, and other discretionary services on a regular basis.

This present suit concerns, for the most part, events which began to unfold in late 1978. In October of that year, Iran Express Lines informed Ameejee that the PISHTAZ IRAN, which at the time was docked in Khorramshahr, Iran, would soon be calling in Karachi for regular servicing and dry-docking work. However, the revolution which erupted in Iran in late 1978 drastically altered those plans. For several months the PISHTAZ IRAN was forced to lay idle in Khorramshahr while the fighting and political upheaval in Iran raged on. Indeed, IEL was unable to communicate directly with Ameejee during the course of the revolutionary period. Exhibits offered into evidence indicate that, between November, 1978 and April, 1979, the Uiterwyck Corporation acted on IEL's behalf in advising Ameejee of the ongoing condition of the PISHTAZ IRAN and, implicitly, of IEL itself. *See* Plaintiff's Exhibits # 3–35. Once the situation within Iran began to stabilize somewhat, preparations were again made for the PISHTAZ IRAN to sail from Khorramshahr to Karachi. On March 29, 1979, Uiterwyck informed Ameejee that the PISHTAZ IRAN would depart for Pakistan on April 2. Plaintiff's Exhibit # 25. Uiterwyck subsequently furnished Ameejee with a list of services which were to be provided to the PISHTAZ IRAN, and authorized expenditures by Ameejee for those services. Plaintiff's Exhibit # 26–35. The vessel arrived in Karachi in mid–April, 1979, and remained at that port until early May. Ameejee faithfully performed the services expected of it, but to date has not been reimbursed for many of its expenditures. This *in rem* action was filed on March 10, 1980.

## DISCUSSION

▮ Counsel are of the opinion that the critical issue presented in this case concerns the proper definition of the agency relationship existing between Ameejee Valleejee and IEL. As a rule, "general" agents are deemed to have waived their rights to maritime liens against individual vessels, whereas "special" agents are permitted to maintain *in rem* actions to recover advances made on behalf of a particular ship. Ameejee contends that, on the present facts, it was the special or local agent of IEL at the time of the April/May, 1979 call, and is therefore entitled to assert a lien against the PISHTAZ IRAN directly. Claimant, on the other hand, submits that Ameejee was a general agent of IEL and should not be permitted to maintain a maritime lien.

The distinction between a general agent and a special agent, as a matter of law, is not altogether clear. Ameejee would have this Court adopt a distinction which focuses on the extent of responsibility and control delegated by the principal to the agent. In support of this proposition, plaintiff cites language in *Benedict* to the following effect:

Quite clearly, owners may not benefit by the advances rule. Neither may general agents, that is, persons to whom the owner has delegated a substantial amount of responsibility including the power to influence the ship's movements, who are presumed to act on the personal responsibility of the owner only unless they can affirmatively prove the existence of an express agreement giving a lien or circumstances from which such an agreement could be implied. On the other hand, special agents, that is, those appointed by the owner to serve in the limited capacity of looking after the essential details of getting a vessel in and out of a particular port, are entitled to liens for advances.

2 *Benedict on Admiralty*, § 33, pp. 3–16 and 3–17 (7th Ed.1975). Plaintiff additionally relies upon the leading case of *Todd Shipyards Corp. v. The City of Athens*, 83 F.Supp. 67 (D.Md.1949), wherein an agent with responsibilities similar to those undertaken by Ameejee was held to be a "special agent" for maritime lien purposes. Claimant, to the contrary, contends that "continuity of service" rather than "scope of responsibility" is the critical determinant. Claimant likewise relies upon *Todd Shipyards*, in particular that portion of Judge Chestnut's opinion which adopts the Restatement of Agency definition of general and special agency:

A general agent is an agent authorized to conduct a series of transactions involving a *continuity of service* (emphasis supplied by the Court). A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service.

*Id.* at 88. Arguing that the 1974 agency contract fully indicates a long–standing "continuity of service" between Ameejee and IEL, claimant asserts that a general agency sufficient to defeat plaintiff's maritime lien should be found to exist.

A review of *Todd Shipyards* and cases cited therein reveals that Judge Chestnut clearly considered both continuity of service *and* scope of responsibility to be relevant in determining the extent of a maritime agency relationship. This conclusion is highlighted by two factors. First, *Todd Shipyards* distinguishes the Fourth Circuit case of *Struthers & Dixon, Inc. v. Green Star SS Corp. (THE CENTAURUS)*, 291 F. 751 (4th Cir. 1923), on the grounds that the general agent in *THE CENTAURUS* had a broader authority and a greater continuity than did the agent found to be "special" in *Todd* itself. As noted by Judge Chestnut, the agent in *THE CENTAURUS* "continuously for many years represented the owner with respect to a whole fleet of ships," while it also "had a much broader scope of authority in relationship to the owner" than did the special agent in *Todd*. 83 F.Supp. at 88–9. Second, prior to adopting the Restatement of Agency "continuity of service" definition mentioned above, Judge Chestnut saw fit to point out that "[t]he problem in each case is to determine from the facts the scope of the authority of the agent in the light of the relationship between the principal and agent." *Id.* at 88. It was the combination of these two factors which led the Court in *Todd* to find a special agency. This Court will consequently consider both factors in determining the proper definition of Ameejee's agency relationship with IEL.

None of the cases cited to the Court by the plaintiff are to the contrary. In *Compagnia Maritima La Empresa v. Pickard*, 320 F.2d 829 (5th Cir. 1964), also known as *THE EDA* an agent which provided services to a single vessel in preparation for the vessel's sale was found to be a special agent for maritime lien purposes. While the holding in *THE ERA* was not expressly grounded upon the lack of continuity of service between principal and agent, the case offers no support for the proposition that continuity of service is an irrelevant consideration. Similar reasoning distinguishes the case of *P. T. Perusahaan Pelay. Sam. Trikora v. T. S. Salzachtal (THE SALZACHTAL)*, 373 F.Supp. 267 (E.D.N.Y.1974), also cited by the plaintiff. This Court is aware that both of these opinions found the agent's financial interest in or affiliation with the owner to be important in determining the proper definition of the agency relationships. Neither of these opinions, however, found this factor by itself to be dispositive. In sum, perhaps, the most that can be said in an attempt to reconcile the various cases has already been said by Judge Chestnut in *Todd Shipyards*: "[t]he decisions of the courts show very different results derived from variable facts." 83 F.Supp. at 87. It is to the variable facts of the present case that our attention must now turn.

■ A review of the facts of this case in light of the teachings of *Todd Shipyards* and *THE CENTAURUS* leads to the inevitable conclusion that Ameejee was the general agent of IEL for maritime lien purposes. Ameejee, it has already been noted, contracted with IEL to be the "exclusive" Karachi agent in 1974, and held a similar position with respect to South Shipping Lines *de facto* since 1972. As exclusive agent, Ameejee acted in Karachi on behalf of the twelve IEL vessels. Each of these vessels made at least one port call in Pakistan during the course of this agency relationship; two of the ships were serviced more than once. From this background, it is apparent that Ameejee "continuously for many years represented the owner with respect to a whole fleet of ships" in a manner and to an extent considered so critical in *THE CENTAURUS* and so important in

*Todd Shipyards.*\* Further, while Ameejee's scope of responsibility may have been somewhat more limited than was the general agent's in *THE CENTAURUS*, it is nonetheless evident that the authority actually possessed by Ameejee, *vis–a–vis* IEL, was considerable. In addition to those duties typically undertaken by Ameejee, discussed at the outset of this opinion, the evidence establishes that Ameejee was also empowered to execute freight booking contracts on IEL's behalf, to issue bills of lading, and to collect monies due IEL's account. While there is no evidence of a financial affiliation between IEL and Ameejee, there is testimony which indicates that IEL revenues constituted 25% of the annual gross agency receipts of plaintiff Ameejee. This financial interdependence, combined with the impressive array of responsibilities delegated to Ameejee during the many years of continuous dealings between Ameejee and IEL, plainly mandates the finding that a general agency relationship existed. The present facts can support no other conclusion.

Nevertheless, our inquiry is not ended here. Claimants correctly point out that, *as a general rule*, a general agent is not permitted to maintain an action against an individual vessel *in rem*. The theory underlying this rule is that a general agent "acts not as a stranger relying on the security of the vessel but as an agent of the owner to whom he looks for payment." *Savas v. Maria Trading Corp.*, 285 F.2d 336, 339 (4th Cir. 1960). However, where the circumstances of a particular case indicate that the general agent *did* rely upon the security of the vessel, the general rule should not be blindly applied. The case law and the commentators unanimously support this conclusion. *See, e. g., Todd Shipyards, supra,* at 87; *The West Irmo,* 1 F.2d 87, 88 (3d Cir. 1924); 2 *Benedict on Admiralty* § 33; and *THE SALZACHTAL,* 373 F.Supp. at 276:

> Although a general agent is presumed to have relied on the credit of the owner, such presumption may be rebutted by

affirmative proof of an express agreement giving him a lien *or such circumstances as justifies the implication of one.* (Emphasis supplied)

Upon careful reflection, this Court is convinced that the circumstances surrounding the April/May, 1979 Karachi port call indicate that Ameejee relied upon the security of the vessel itself in rendering services and advances to the PISHTAZ IRAN, and did so with the knowledge and acquiescence of IEL. Thus, Ameejee will be permitted to maintain this action *in rem.*

These peculiar circumstances are not difficult to surmise. As a result of the outbreak of the Iranian revolution, the financial stability of IEL was quite naturally placed in considerable jeopardy. Testimony elicited at trial indicated that the pre–revolution assets of IEL consisted almost entirely of the PISHTAZ IRAN, a building located in Teheran, and some $3–4 million dollars worth of machinery located in Khorramshahr. Testimony further established, as earlier noted, that IEL was unable to carry out direct communications with most of the outside world, including Ameejee, during the course of the revolution. From this precarious background, it is not surprising that Ameejee repeatedly requested assurances from Uiterwyck that it (*i. e.,* Ameejee) would be promptly reimbursed for any monies ultimately advanced for the benefit of the PISHTAZ IRAN. *See* plaintiff's Exhibits # 29–35 and 96. In response to these requests Uiterwyck, which had remained in contact with IEL during the period of internal unrest and was acting on IEL's behalf, both authorized Ameejee to obtain reimbursements out of the PISHTAZ IRAN's pre–paid freights and indicated that further reimbursements would be forthcoming immediately upon receipt of a proper accounting for services rendered. *See* Plaintiff's Exhibit # 97. Viewed together, these events sufficiently establish Ameejee's lack of reliance on the owner's credit so as to justify the conclusion that

---

\* It should also be noted that Mujdaba G. Inayetullah, the Managing Partner and Chief Executive Officer of Ameejee, candidly admitted at trial that Ameejee had an ongoing relationship with IEL and South Shipping Lines.

the credit of the vessel *itself* was relied upon, with IEL's acquiescence, during the rendering of the April/May services. A maritime lien having thereby been established, we turn now to consider the extent of Ameejee's recovery.

Recovery in maritime lien cases is limited to the extent of "necessaries" furnished to the vessel for which compensation has not already been made. The courts and commentators have broadly construed the term "necessaries." *See, e. g., J. Ray McDermott & Co. v. Offshore Menhaden Co.,* 262 F.2d 523 (5th Cir. 1959) Gilmore and Black, *The Law of Admiralty,* § 9–34 (2d Ed.1975). Furthermore, in the instant case the parties do not dispute that the services provided the PISHTAZ IRAN were indeed necessaries. Only the amount is in dispute. Ameejee seeks recovery of a sum equal to the dollar equivalent of 990,002.72 Pakistan rupees, plus pre–judgment interest from the date of the last supplementary statement of account (September 30, 1979) to the ending date of trial (November 15, 1980). However, of this 990.002.72 figure, 253,256.24 represents a balance carried forward for services provided the PISHTAZ IRAN *prior to* the April/May, 1979 port call. This latter figure must be subtracted from Ameejee's recovery, as it concerns expenditures made during Ameejee's normal general agency relationship with IEL. No additional sums will be subtracted. Accordingly, judgment will be entered in favor of the plaintiff in the amount of the dollar equivalent of 736,746.48 Pakistan rupees, plus pre–judgment interest at the normal 6% rate. Converted on the basis of 9.8389 rupees per dollar, as stipulated by the parties, the total recovery is $79,935.45.

The findings of fact and conclusions of law contained herein are made in accordance with the provisions of Rule 52, F.R. Civ.P., whether or not so identified.

Accordingly, for the reasons stated herein, it is this 4th day of December, 1980, by the United States District Court for the District of Maryland, ORDERED: that judgment BE and the same is hereby entered in favor of Ameejee Valleejee and Sons in the amount of $79,935.45 including interest to November 15, 1980, with interest at the rate of 10% from November 15, 1980 until said judgment is satisfied.